**Lorece TEETERS, Plaintiff,**

v.

**Ray SCOTT, Individually; Richard Howell, as Acting Director of the Arkansas Department of Human Services, Division of Mental Health Services, Benton Services Center; Richard Norton, Individually and as Administrator of the** Benton Services Center of the Arkansas Department of Human Services, Division of Mental Health Services; and Charles McDowell, Individually and as Director of Nursing of the Benton Services Center of the Arkansas Department of Human Services, Division of Mental Health Services, Defendants.

No. LR-C-87-908.

United States District Court, E.D. Arkansas, W.D.

April 5, 1990.

constitutionality or any of the classifications drawn therein.

John T. Lavey, Lavey, Harmon and Burnett, Little Rock, Ark., for plaintiff.

J. Denhammcclendon, Asst. U.S. Atty., Little Rock, Ark., for defendants.

## MEMORANDUM OPINION

ROY, District Judge.

This is a 42 U.S.C. § 1983 action in which plaintiff seeks both money damages and permanent injunctive relief from defendants. The Court has jurisdiction over plaintiff's claims pursuant to 28 U.S.C. § 1343(3) and (4). After a two-day trial and thorough briefing schedule, this matter is ripe for adjudication.

Plaintiff, Lorece Teeters, has been employed at the Benton Services Center ("BSC") from 1972 to the present. Since 1974, plaintiff has been employed as a Licensed Psychiatric Technician Nurse ("LPTN"). Except for the incident which gave rise to this litigation, plaintiff's performance with BSC has been satisfactory and without controversy.

A patient by the name of Allison Pool ("Allison") was admitted to the BSC campus on January 11, 1984. Allison was initially assigned to Elm Court at BSC. Plaintiff, who at that time worked at Maple Court, had her first contact with Allison in March 1985 when Allison was assigned to Maple Court. Plaintiff had daily contact with Allison and observed her on a regular basis from March to August, 1985. Among other things, plaintiff assisted Allison with bathing, grooming and leaving Maple Court to attend classes. Plaintiff testified that Allison interacted and got along well with the other Maple Court patients, most of whom were elderly.

In August of that same year, Allison was transferred to Aspen Court to be placed in a behavioral modification program. Plaintiff had no contact with Allison until the following March. According to BSC records, Allison was assigned to Aspen because of her "maladaptive behaviors which included manipulative behavior, refusal to follow instructions, refusal to care for herself, tantrums, aggression, and destruction of property." (Plaintiff's Exhibit 12). She was placed in a behavior modification program on September 16, 1985. The program included a provision for placing Allison in "time out" (requiring her to sit on a stool in a corner or facing a wall for a period of seven minutes) when she engaged in unacceptable behaviors.[1] Allison's mother, Patricia Pool, approved the program designed for Allison, as did the Human Rights Chairperson, Jan Sikes, the Chief Psychologist, Phil Daugherty, and the primary physician, Dr. Jack King. Thereafter, Allison was in a behavior modification program of one kind or another during all times relevant hereto.[2]

In March 1986, plaintiff was assigned to Aspen and remained there for roughly one year. During that time, she ministered to Allison at least once or twice a week. Plaintiff studied Allison's behavior modification program and, along with a number of co-workers, received some eight hours of instruction regarding the procedures to be utilized in implementing that program. During these training sessions, plaintiff and her colleagues were admonished that

---

**1.** Since the time was restarted whenever Allison got off her stool or otherwise acted inappropriately during time out, on some occasions she was required to remain in time out for hours on end.

**2.** For a number of reasons, Allison's behavior modification program was modified several times from 1985 through 1987.

they should not let their personal feelings interfere with implementation of the program. Although she had no real problem with the program as written, plaintiff did have objections to the manner in which the program was implemented.

Plaintiff testified that from March 1986 to March 1987 she observed that Allison was deprived of meals at least once a week and deprived of bathroom privileges at least once a month. It appears that most of these deprivations resulted from Allison being kept in time out for extended periods.[3] Plaintiff also testified that Pat Lambert and Sharon Harris, behavioral management technicians, were indifferent to Allison's needs and were on occasion "mean" to her. As examples, plaintiff cited instances in which Harris and Lambert would "tear up" Allison's bed and require her to remake it if she did not complete the task quickly enough the first time, or Harris and Lambert would require Allison to clean herself and the immediate area whenever she urinated or defecated on herself. In addition to those she personally observed, plaintiff learned of other incidents from co-workers in which Allison was deprived of meals or bathroom privileges, or both. Plaintiff testified that on numerous occasions she complained to one of her immediate supervisors, Registered Nurse Betty Esworthy, about the deprivations being visited upon Allison, but was told by Esworthy that she (Esworthy) did not write or run the program and there was nothing she could do because she just worked at BSC like plaintiff. Nothing ever came of any of plaintiff's complaints to her immediate supervisor.

On March 1, 1987, plaintiff was transferred from Aspen to Oak Court in the Lakeview building on the BSC campus, where she has continued to work until the present. Her transfer was apparently brought about by her dissatisfaction with and opposition to certain parts of Allison's program. On March 8, 1987, after completing her work shift, plaintiff went to defendant McDowell's house on the BSC campus to speak with him about Allison's treatment. At that time plaintiff informed McDowell that Allison was being deprived of meals and bathroom privileges and that Lambert and Harris were being mean to Allison. McDowell advised plaintiff that he "would take care of it." However, on several occasions later that month, plaintiff was told by another LPTN, Phyllis Bearden, that Allison was still being deprived of meals. When plaintiff learned that such deprivations had occurred again on March 27, 1987, she concluded that McDowell was not going to correct the situation and she decided to telephone Patricia Pool to apprise her of the situation. After finishing work on Saturday, March 28, 1987, plaintiff placed an anonymous telephone call to Ms. Pool and relayed her concerns.

Patricia Pool contacted McDowell on March 31, 1987, and told him of the anonymous telephone call. During her conversation with McDowell, Ms. Pool opined that Allison's aggressiveness had worsened since she had been placed in the program. (Plaintiff's Exhibit 8). Later that same day, BSC suspended Allison's behavioral modification program. (Plaintiff's Exhibit 12).

Shortly thereafter, utilizing methods that were at best questionable, and were in all likelihood fraudulent, Harris obtained information from Southwestern Bell Telephone Company indicating that plaintiff was the person who had placed the anonymous call to Ms. Pool. Harris then passed the information on to Aspen Unit Manager Dr. Michael Wyrick, a behavioral psychologist at BSC, who in turn disseminated it to defendant Norton and other officials at the BSC campus. Pursuant to Norton's request, Saline County Prosecuting Attorney Joe Kelly Hardin served a subpoena upon Southwestern Bell seeking copies of plaintiff's telephone records for the date of March 28, 1987. In correspondence from Southwestern Bell's Staff Manager for Security to Hardin, the requested records were furnished indicating that plaintiff had

---

**3.** When deprived of regular meals, Allison was offered a nutritional supplement or orange juice instead. It was common knowledge, however, that Allison did not like and would not drink either the supplement or the orange juice.

indeed placed a call to Ms. Pool on March 28, 1987. Soon thereafter, Hardin supplied Norton with a copy of plaintiff's telephone records. In reliance upon those records, McDowell recommended to Norton that plaintiff be suspended from her duties without pay for 10 days commencing July 23, 1987, and that she be placed on probation for six months beginning that same date. Norton agreed with McDowell's recommendation.

In a meeting with McDowell on July 20, 1987, plaintiff was informed of the suspension and probation and advised that these sanctions were imposed on account of her failure to follow the in-house abuse policy, her failure to follow the channels of communication and levels of authority of the Nursing Service Policy, and her failure to follow the Employee Conduct Standard on confidentiality. No other reasons for the sanctions were articulated by any BSC official. Both McDowell and Norton testified that the sanctions would not have been imposed against plaintiff if she had not placed the telephone call to Ms. Pool. On December 21, 1987, plaintiff filed the instant action against defendants contending that she had been disciplined in violation of rights secured to her under the First Amendment of the United States Constitution.

The Eighth Circuit has taken the opportunity to set out the standard which a public employee must meet in order to recover upon the type of claim presented herein, stating:

Claims by public employees that they have suffered job-related sanctions as a result of speech are considered in accordance with the now familiar analysis set out by the Supreme Court in *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). As a threshold matter, a plaintiff must demonstrate that the speech or conduct, which she alleges as the basis of the adverse employment decision, was entitled to constitutional protection; she must then show that this protected conduct was a substantial or motivating factor in the adverse employment decision; the burden then shifts to the employer to show by a preponderance of the evidence that it would have taken the same action absent the employee's protected conduct.

*Cox v. Dardanelle Public School District,* 790 F.2d 668 (8th Cir.1986). Accordingly, this Court must first decide whether plaintiff's telephone call to Patricia Pool and the statements which preceded it were entitled to constitutional protection.

The Court must engage in a two-step inquiry, one of law, in determining whether plaintiff's speech was constitutionally protected. *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). Initially, the Court must decide if the telephone conversation with Ms. Pool constituted a matter of public concern. Whether a public employee's speech relates to a matter of public concern must be considered in light of the "content, form and context of a given statement, as revealed by the whole record." *Id.* at 147–48, 103 S.Ct. at 1690. The fact that plaintiff's expression was of a private nature rather than public does not remove it from the realm of public concern, for "freedom [of speech] is [not] lost to the public employee who arranges to communicate privately ... rather than to spread his views before the public." *Givhan v. Western Line Consolidated School District,* 439 U.S. 410, 415–16, 99 S,Ct. 693, 696–97, 58 L.Ed.2d 619 (1979). "The question in each case is whether the employee's expressions can be fairly characterized as relating to any matter of political, social, or other concern to the community." *Cox,* 790 F.2d at 672.

■ The telephone conversation between plaintiff and Ms. Pool concerned the standard of care being provided to Allison Pool, a patient at a public institution. In addition, other remarks made by plaintiff both prior and subsequent to the telephone call addressed problems she perceived with some components of the behavior modification programs generally. Analyzing the content, form and context of the telephone conversation in question, as well as the other comments, the Court finds that plaintiff's speech did indeed touch on matters of

public concern—that is, the quality and propriety of the standard of care given to mental patients at public institutions.

■ Having decided that plaintiff's expressions constituted speech on a matter of public concern, the Court must now balance the interests of the employee as a citizen in commenting upon matters of public concern with the interests of the state as an employer in promoting the efficient and effective public service it must perform through its employees. "An employee's interest in freely commenting on matters of public concern must generally give way to the state's interest in efficiently fulfilling its responsibilities where the employee's speech significantly impairs her ability to perform her duties, disrupts working relationships and harmony among co-workers, or otherwise impedes the normal operation of the institution." *Cox*, 790 F.2d at 673–74. Where the speech is private in nature, the state is also entitled to consideration of time, place and manner factors in the determination of whether the private expression affected or threatened working relationships and the efficient operations of the institution. *Givhan*, 439 U.S. at 415 n. 4, 99 S.Ct. at 696 n. 4.

Applying these considerations to the case *sub judice*, the Court finds that plaintiff's interests in making the statements concerning Allison Pool's treatment and the behavioral modification programs outweigh whatever disruption or discord those statements might have caused.[4] Although the telephone call resulted in the suspension of Allison's treatment program and appears to have made those charged with caring for Allison somewhat unsure of how to deal with her, the Court finds that these problems were short-lived and of no lasting significance. Probably the best evidence that plaintiff's speech did not significantly impair her ability to perform her duties or work with others is the fact that she has remained in the employ of BSC since the completion of her 10–day suspension. Ob-

viously, plaintiff's expressions did not impair her ability to satisfactorily perform her duties. The Court finds that plaintiff's expressions about Allison Pool's treatment and the behavioral modification program were constitutionally protected.

■ Having resolved the two-step inquiry in favor of plaintiff, the Court must continue with the *Mt. Healthy* analysis and determine whether plaintiff's protected conduct was a substantial or motivating factor in her suspension and probation. There can be no serious dispute on this point. The testimony and documentary evidence quite clearly reveal that the protected conduct was more than a substantial or motivating factor in the sanctions imposed against her.

Finally, the Court must decide whether defendants would have taken the same punitive actions against plaintiff absent her protected conduct. There can be no genuine debate on this point, as well. Both McDowell and Norton testified that no sanctions would have been imposed against plaintiff had she not made the telephone call to Patricia Pool. Having resolved all of the *Mt. Healthy* factors in her favor, plaintiff is entitled to judgment against defendants.

Plaintiff shall have judgment against defendants Howell, Norton and McDowell, collectively in the amount of $711.00, minus the normal payroll deductions, plus prejudgment interest at the rate of 6% per annum. In addition to the monetary relief, defendants are directed to expunge from plaintiff's employment records all evidence of the suspension and probation imposed against her as a result of her protected conduct. Yet, due to plaintiff's failure to fully comply with applicable BSC policies, defendants may leave or place in plaintiff's records documentation of her noncompliance with the policies and her failure to fully understand them. However, no punitive measures shall be imposed on account

---

4. Although plaintiff may have failed to fully comply with certain BSC policies relating to the reporting of patient abuse, the Court is of the opinion that her noncompliance was largely insignificant. Defendant McDowell appears to have been as guilty as plaintiff in not fully complying with the policies. Further, the Court finds that plaintiff properly brought her concerns to the attention of various superiors before contacting Ms. Pool.

of plaintiff's previous failure to comply with or understand those policies. Finally, defendants shall not retaliate against plaintiff for engaging in protected conduct or for filing this lawsuit. Counsel for plaintiff is directed to prepare a judgment consistent with this Opinion and submit it to the Court within seven (7) days of the date hereof.