Divaker R. KATTAR, Plaintiff,

v.

THREE RIVERS AREA HOSPITAL AUTHORITY, Brad Solberg, Ro Jong Park, Kalamazoo Emergency Associates, P.C. and Andrew W. Latham, Defendants.

No. 4:97–CV–147.

United States District Court,
W.D. Michigan,
Southern Division.

April 26, 1999.

James L. Dyer, Vandervoort, Cooke, McFee, Christ, et al, Battle Creek, MI, for Divaker R. Kattar, plaintiff.

William M. Newman, Lague, Newman & Irish, Muskegon, MI, Mark D. Willmarth, Willmarth & Tanoury, Detroit, MI, for Three Rivers Area Hospital Authority, Brad Solberg, defendants.

William M. Newman, Lague, Newman & Irush, Muskegon, MI, for Ro Jong Park, defendant.

Charles E. Ritter, Miller, Canfield, Paddock & Stone, Kalamazoo, MI, for Kalamazoo Emergency Associates, P.C., Andrew W. Latham, defendants.

## OPINION

QUIST, District Judge.

Plaintiff, Divaker Kattar ("Kattar"), a medical doctor, has sued Defendants, Three Rivers Area Hospital Authority ("TRAHA"), Brad Solberg ("Solberg"), and Ro Jong Park ("Park"), for violation of his procedural and substantive due process rights and his First Amendment free speech rights under 42 U.S.C.1983 and conspiracy to violate his civil rights under 42 U.S.C. § 1985, in connection with his removal as Medical Director of Three Rivers Area Hospital ("TRAH").[1] Kattar also seeks to invoke this Court's supplemental jurisdiction under 28 U.S.C. § 1367 over his state law claims for tortious interfer-

1. Kattar also sued Kalamazoo Emergency Associates and Andrew W. Latham but has since settled his claims with those Defendants.

2. The Court notes that the TRAH/ECS Agreement referred to by the parties is dated July 1,

ence with business relationship, retaliatory discharge in violation of public policy, civil conspiracy, and intentional infliction of emotional distress. Now before the Court is Defendants' Motion for Summary Judgment.

### Facts

TRAH is an acute care general hospital located in Three Rivers, Michigan, which is operated by TRAHA, a public body created under Michigan law by the vote of residents of the City of Three Rivers, St. Joseph County, and the Townships of Constantine, Fabius, Lockport, and Park. TRAH entered into a written contract ("TRAH/ECS Agreement") with Emergency Care Services ("ECS"), a division of Borgess Health Alliance, to provide emergency medicine services to TRAH's patients. In turn, ECS subcontracted with Kalamazoo Emergency Associates, P.C. ("KEA") to provide emergency physician services to TRAH pursuant to the TRAH/ECS Agreement. In addition to providing for emergency medicine services, the TRAH/ECS Agreement specified the procedure for the appointment of TRAH's Emergency Services Medical Director ("ESMD"). Paragraph 8 of the TRAH/ECS Agreement, which contains the appointment procedure, provides:

> [KEA] will designate to ECS, and ECS shall recommend to [TRAH], an Emergency Physician for the position of [ESMD]. The Emergency Physician designated by [KEA] and recommended by ECS must apply for and be appointed [ESMD] in accordance with [TRAH]'s Medical Staff Bylaws. The duties of the [ESMD] are delineated in Appendix A attached to this Agreement.

(TRAH/ECS Agreement ¶2.2(A)(8), Pl.'s Resp.Br.Ex. 16.)[2]

1996, subsequent to the occurrence of some of the relevant facts. However, because both parties refer to the same document in their briefs, the Court will assume that the same contractual provisions were in effect at all relevant times.

On June 5, 1995, KEA entered into a written agreement with Kattar's wholly-owned medical professional corporation, Kattar, P.C. ("KEA/Kattar, P.C. Agreement"), which provided that Kattar, P.C. would provide emergency physician services at TRAH and other hospitals to which KEA furnished services. Under the KEA/Kattar, P.C. Agreement, Kattar, P.C. was an independent contractor and Kattar was recognized as an employee of Kattar, P.C. (*See* KEA/Kattar, P.C. Agreement ¶¶ 1,2, Defs.' Br.Supp.Ex. H.) On November 11, 1995, KEA and Kattar, P.C. amended the KEA/Kattar, P.C. Agreement to provide for additional compensation in anticipation of TRAH's appointment of Kattar to the ESMD position. At or about that time and pursuant to the TRAH/ECS Agreement, KEA recommended that Kattar be appointed ESMD. On November 15, 1995, TRAH made the appointment. Kattar served as the ESMD until March 21, 1997, when he was removed by Solberg, the Chief Executive Officer of TRAH, apparently without objection from KEA. During the time Kattar served as ESMD, he also held the position as Service Chief for Emergency Medicine, either as a separate position or as part of his responsibilities as ESMD.[3]

In February 1997, Kattar's relationship with TRAH began to deteriorate. Kattar alleges that the rift occurred because he raised concerns about inadequate medical care provided by Defendant Park, TRAH's Chief of Staff, to a patient known as Katherine I who died while admitted to TRAH.[4] Defendants assert that Kattar was removed from the position because of his failure to perform his duties as ESMD.

On March 6, 1997, Solberg sent a letter to Dr. Andrew W. Latham ("Latham"), the president of KEA, which detailed Solberg's concerns about Kattar's "ability to function within [the] emergency department, most notably as the medical director." (Letter from Solberg to Latham of 3/6/97, Ex. C to Solberg Aff., attached to Defs.' Br.Supp.) One week later, Solberg made a formal request to Latham that KEA remove Kattar from the ESMD position. Solberg indicated, however, that TRAH would have no objection to Kattar continuing in the regular call rotation. KEA did not act on Solberg's request, and Kattar requested that Solberg provide the reasons for seeking his removal from the position. On March 19, 1997, Solberg sent a memorandum to Kattar which outlined the reasons for the removal and asked Kattar to submit his resignation as ESMD by March 20. When Kattar refused to resign, Solberg sent Kattar a memorandum dated March 21, 1997, notifying Kattar that he was removed as ESMD effective that day.

Kattar was permitted to remain on staff as an emergency room physician after his removal. Shortly thereafter, KEA sent a notice to Kattar that KEA would be terminating the KEA/Kattar, P.C. Agreement as of July 16, 1997. However, on June 19, 1997, Solberg sent a written request to KEA that Kattar be removed from service immediately "[d]ue to recent concerns regarding care that [was] reported to [Solberg] by [TRAH's] Chief of Staff," Defendant Park. (Mem. from Solberg to Latham of 6/19/97, Pl.'s Resp.Br.Ex. 13.) KEA honored Solberg's request and terminated the KEA/Kattar, P.C. Agreement that day. Kattar did not work at TRAH after that time. Kattar contends that Solberg's request for Kattar's removal had nothing to do with Kattar's performance, but instead was intended to prevent Kattar from further discussing the Katherine I incident with TRAH staff and others.

---

**3.** Although Defendants denied in their Answer that Kattar held the position of Service Chief, they do not dispute this fact in any of their briefs. Moreover, Kattar has presented evidence produced by TRAH which demonstrates that Kattar was appointed Service Chief for the 1997 year. (*See* Pl.'s Resp. Br.Ex. 15.) Therefore, at least for purposes of this motion, the Court will take as true Kattar's allegations that he held the Service Chief position.

**4.** Kattar apparently believed that the patient died because a surgical sponge was not removed from the patient's abdomen.

### Summary Judgment Standard

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R.Civ.P. 56. The rule requires that the disputed facts be material. Material facts are facts which are defined by substantive law and are necessary to apply the law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A dispute over trivial facts which are not necessary in order to apply the substantive law does not prevent the granting of a motion for summary judgment. *Id.* at 248, 106 S.Ct. at 2510. The rule also requires the dispute to be genuine. A dispute is genuine if a reasonable jury could return judgment for the non-moving party. *Id.* This standard requires the non-moving party to present more than a scintilla of evidence to defeat the motion. *Id.* at 251, 106 S.Ct. at 2511 (citing *Schuylkill and Dauphin Improvement Co. v. Munson,* 81 U.S. 442, 14 Wall. 442, 448, 20 L.Ed. 867 (1871)).

A moving party who does not have the burden of proof at trial may properly support a motion for summary judgment by showing the court that there is no evidence to support the non-moving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324–25, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). If the motion is so supported, the party opposing the motion must then demonstrate with "concrete evidence" that there is a genuine issue of material fact for trial. *Id.; Frank v. D'Ambrosi,* 4 F.3d 1378, 1384 (6th Cir.1993). The court must draw all inferences in a light most favorable to the non-moving party, but may

grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Financial Corp. v. Van Sickle,* 967 F.2d 233, 236 (6th Cir. 1992) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

### Discussion

## I. Federal Claims

### A. Due Process

In Count I of his complaint, Kattar alleges under 42 U.S.C. § 1983 that Defendants violated his right to be free from deprivations of his property without due process by removing him from the ESMD and/or Service Chief position without a hearing as required by the Medical Staff Bylaws.[5] Defendants contend that they are entitled to summary judgment on Kattar's due process claim because did not have a property interest in the ESMD position.[6]

■ Under the Fourteenth Amendment, no state actor may "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. "The Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits." *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 576, 92 S.Ct. 2701, 2708, 33 L.Ed.2d 548 (1972). Thus, to be entitled to the protections of the Fourteenth Amendment, a plaintiff must show that he possesses a property interest which may

---

5. Kattar also alleged in Count I that Defendants violated his due process rights by depriving him of his active staff privileges. (*See* Compl. ¶ 65.) However, the Court finds that Kattar has abandoned this aspect of his claim by failing to respond to Defendants' arguments and by his admission that "he continued to have Active Staff privileges as an Emergency Room Physician...." (Pl.'s Br. Opp'n at 8.) Moreover, Kattar has failed to rebut Defendants' evidence which shows that Kattar's staff privileges were not terminated.

(*See* Chambers Aff. ¶¶ 2, 3, attached to Defs.' Br.Supp.)

6. Defendants also argue that Kattar did not have a liberty interest in the ESMD position. Kattar only contends in his brief that he held a property interest in his appointed position and does not argue that he had a liberty interest. Therefore, the Court understands Kattar's claim to be only that he was deprived of a property interest.

be afforded constitutionally guaranteed due process. *See Bailey v. Floyd County Bd. of Educ.,* 106 F.3d 135, 141 (6th Cir. 1997); *Vinyard v. King,* 728 F.2d 428, 430 & n. 5 (10th Cir.1984).

■ Property interests are not defined by the Constitution but instead "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Roth,* 408 U.S. at 577, 92 S.Ct. at 2709. A property interest must be based upon "rules or mutually explicit understandings that support [the plaintiff's] claim of entitlement to the benefit and that he may invoke at a hearing." *Perry v. Sindermann,* 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972) (citing *Roth* ). However, "an abstract need or desire" for or "a unilateral expectation of" a benefit is insufficient to create a property interest. *Roth,* 408 U.S. at 577, 92 S.Ct. at 2709. Typically, although not exclusively, property interests are created by express contract, implicit understandings supported by informal policies and procedures, or statute. *See Perry,* 408 U.S. at 601–03, 92 S.Ct. at 2699–2700; *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 538–39, 105 S.Ct. 1487, 1491, 84 L.Ed.2d 494 (1985).

■ Defendants contend that Kattar had no property interest in the ESMD position because the provisions of 'the TRAH/ECS Agreement and the TRAH Medical Staff Bylaws, by which Kattar was appointed to and discharged from the position, did not create a legitimate expectation of a continuing right to hold the position or of protection from removal from the position. In particular, Defendants point out that Kattar was appointed to the ESMD position pursuant to paragraph 8 of the TRAH/ECS Agreement, which provides:

> [KEA] will designate to ECS, and ECS shall recommend to [TRAH], an Emergency Physician for the position of [ESMD]. The Emergency Physician designated by [KEA] and recommended by ECS must apply for and be appointed [ESMD] in accordance with [TRAH]'s Medical Staff Bylaws. The duties of the [ESMD] are delineated in Appendix A attached to this Agreement.

(TRAH/ECS Agreement ¶ 2.2(A)(8), Pl.'s Resp.Br.Ex. 16.) Defendants contend that Kattar was removed from the ESMD position pursuant to section 9.3 of the TRAH Medical Staff Bylaws, which states in relevant part that:

> Removal from office of a medico-administrative officer for grounds unrelated to his professional clinical capability and his exercise of clinical privileges may be accomplished in accordance with the usual personnel policies of the Hospital or the terms of such officer's employment agreement, if any . . . .

(TRAH Medical Staff Bylaws § 9.3, Pl.'s Resp.Br.Ex. 12.) In turn, Defendants contend that Kattar was removed in accordance with section 9.3 of the bylaws because the removal was accomplished pursuant to paragraph 11 of the TRAH/ECS Agreement, which provides:

> [TRAH] may request, in writing, upon reasonable grounds, to remove one or more Emergency Physician(s) from the lists of those who perform services pursuant to the agreement. In the event that ECS or [KEA] does not agree that there are reasonable grounds for such requests, ECS, [KEA], and/or the subject physician shall be entitled to exercise the hearing and appeal rights afforded to medical staff members under the Hospital's Medical Staff Bylaws. This subparagraph may be changed by ECS upon the renegotiation of the contract between ECS and [KEA].

(TRAH/ECS Agreement ¶ 2.2(A)(11), Pl.'s Resp.Br.Ex. 16.)

Defendants cite *Bloom v. Hennepin County,* 783 F.Supp. 418 (D.Minn.1992) (mem. op.), as support for their argument that Kattar did not have a property interest in the ESMD position. In *Bloom,* the plaintiff was a physician who was employed by a nonprofit corporation which

was the exclusive provider of physician services to a public hospital. As a member and employee of the nonprofit corporation, the plaintiff had staff privileges at the hospital. The plaintiff's employment was terminated by the nonprofit corporation and, consequently, the plaintiff's staff privileges at the hospital were also terminated. The plaintiff filed suit alleging, among other things, that the hospital and the nonprofit corporation deprived him of due process by terminating his staff privileges without a hearing as required by the hospital's medical staff bylaws. *See id.* at 436. The court rejected the plaintiff's arguments that staff privileges are *ipso facto* property interests under the Fourteenth Amendment and that the hospital bylaws, which required a hearing before the termination of staff privileges, gave rise to a protected property interest. *See id.* at 437. The court found that the plaintiff's relationship with the hospital was governed by both his contract with the nonprofit corporation and the hospital's bylaws. The court also noted that the plaintiff's contract with the nonprofit corporation provided that his employment could be terminated without cause upon sixty days notice and required the plaintiff to abide by the terms of the nonprofit corporation's contract with the hospital. The court concluded that because the plaintiff was aware that his staff privileges could be terminated if his employment was terminated by the nonprofit corporation or the nonprofit corporation lost its contract with the hospital, his "interest in his staff privileges was merely a unilateral expectation that they would continue, not a legitimate claim of entitlement giving rise to a protected property interest under *Roth.*" *Id.* at 438.

Kattar argues that his status as Service Chief, which he obtained either by virtue of his appointment as ESMD or through a separate appointment, was subject to a separate removal provision under the TRAH Medical Staff Bylaws which was not limited by either the TRAH/ECS Agreement or the KEA/Kattar P.C. Agreement. In particular, Kattar points to section 10.2–1(b) of the bylaws, which provides that:

> A Service Chief shall serve a one-year term commencing with his appointment. He may be eligible to succeed himself. Removal of a Service Chief may be done by the Authority Board acting upon its own recommendation, or upon the recommendation of the MEC or a two-thirds (⅔) majority vote of the members of the Medical Staff eligible to vote. Removal from office shall be accomplished pursuant to Section 9.3.

(TRAH Medical Staff Bylaws § 10.2–1(b), Pl.'s Resp.Br.Ex. 12.) Kattar contends that this section, which provides for a one-year term for the Service Chief position, is sufficient to create a property right because it details the proper removal procedure and gave him the opportunity to be heard by the Authority Board or the Medical Staff eligible to vote prior to being removed from that position.

Kattar also contends that Defendants' reliance on paragraph 11 of the TRAH/ECS Agreement as supporting his removal from the ESMD position is misplaced because that paragraph is limited to removal of "Emergency Physicians" who perform services for TRAH pursuant to the TRAH/ECS Agreement. Kattar argues that that paragraph was not applicable to his removal from the ESMD position because it does not cover situations where TRAH seeks to remove the ESMD or Service Chief.

The Court finds that regardless of whether the ESMD and Service Chief positions were the same or different positions, or whether Kattar actually held both positions, or whether paragraph 11 of the TRAH/ECS Agreement applied to the removal of Kattar from the ESMD position, Kattar's due process claim fails because even if all inferences are accepted in a light most favorable to Kattar, he has not shown that he held a property interest in either position that is protected under the Fourteenth Amendment. In analyzing the issue, it is important to bear in mind the contours of the relationship between TRAH and Kattar and exactly what rights

are at issue. First, unlike the large majority of cases which have determined whether a particular claim of entitlement to a benefit amounts to a property interest, this case does not involve public employment because Kattar was an employee of his professional corporation and not TRAH. Second, the case does not implicate contract rights because Kattar, whether individually or through his professional corporation, did not have a contractual relationship with TRAH. Thus, Kattar was not an independent contractor with TRAH. Finally, the case does not involve termination of staff privileges. Therefore, cases which have dealt with the issue of whether staff privileges constitute property interests are not particularly germane to the facts in this case.

One case which the Court finds analogous to this case in several respects is *San Bernardino Physicians' Services Medical Group, Inc. v. County of San Bernardino*, 825 F.2d 1404 (9th Cir.1987). The plaintiff in that case was a professional corporation owned by a group of doctors which had contracted with a county to provide emergency and burn care treatment and surgical services to a county-operated medical center. Prior to the expiration of the contracts, the county notified the plaintiff that it would be terminating the contract. The county rescinded its termination after the plaintiff filed an action in state court challenging the termination. However, after the recission but before the expiration of the contracts, the plaintiff sued the county in federal court alleging that threats and harassment by county employees violated the plaintiff's due process rights. *See id.* at 1406. In considering whether the plaintiff's contracts with the county gave rise to a protected property interest, the Ninth Circuit rejected the plaintiff's attempt to characterize the contracts as employment contracts on the grounds that the plaintiff could not be an employee and the individual physicians who provided the actual services were employees of the plaintiff professional corporation rather than the state. *See id.* at 1409. The court determined that the contract was a contract to supply medical services which was more akin to other types of commercial contracts. The court concluded that the plaintiff's contract did not give rise to a protected property interest, reasoning that "the farther the purely contractual claim is from an interest as central to the individual as employment, the more difficult it is to extend it constitutional protection without subsuming the entire state law of public contracts." *Id.* at 1409–10.

The facts in this case provide even less support for a protected property interest than the facts in *San Bernardino Physicians' Services*. Here, Kattar cannot even point to a contract with TRAR which arguably provides a basis for a property interest. Kattar's interest in the ESMD and Service Chief positions is perhaps best described as a naked appointment pursuant to the TRAH/ECS Agreement. Kattar did provide services, but those services were provided pursuant to TRAH pursuant to the KEA/Kattar, P.C. Agreement.

█ Kattar's best argument is that section 10.2–1(b) of the Medical Staff Bylaws gave rise to a property interest, because that provision is the only basis from which it could be argued that there was a mutual understanding that Kattar had a continuing right to the Service Chief position. However, contrary to Kattar's assertion, section 10.2–1(b) does not require a pre-termination hearing or allow Kattar an opportunity to be heard before being removed. More importantly, that provision does not place substantive limits, such as "just cause," on the right to remove a Service Chief. The provision merely provides a process by which removal may be accomplished. Procedures, alone, do not create a legitimate claim of entitlement to a benefit. *See Haron v. Board of Educ. of the City of New York*, 411 F.Supp. 68, 71 (E.D.N.Y.1976) (stating that "[a] probationary teacher does not gain a 'legitimate claim of entitlement' to a tenured position simply because the termination procedure becomes more complex and formal than it was previously" (citation omitted)). As the Tenth Circuit has stated,

[b]y themselves ... procedural protections do not support a "legitimate claim of entitlement" to future employment. At best, they merely support a claim of entitlement to the procedural protections themselves. At least five circuits [,including the Sixth Circuit,] have adopted the view that procedural protections alone do not create a protected property right in future employment; such a right attaches only when there are substantive restrictions on the employer's discretion. For example, if a statute, regulation, or policy specifies the grounds on which an employee may be discharged, or restricts the reasons for discharge to "just cause shown," then the employee has a right to continued employment until such grounds or causes are shown.

*Asbill v. Housing Auth. of Choctaw Nation*, 726 F.2d 1499, 1502 (10th Cir.1984); *see also S & D Maintenance Co. v. Goldin*, 844 F.2d 962, 967 (2d Cir.1988) (finding lack of "for cause" provision in meter maintenance contract precluded finding that supplier had property interest in continuation of contract).

Because Kattar has not shown that there were substantive limitations upon his removal from his position as ESMD or Service Chief, the Court concludes that he did not possess a protected property interest in either the ESMD or Service Chief position. Therefore, Kattar's procedural due process claim will be dismissed.[7]

## B. First Amendment Claim

 In Count II of his complaint, Kattar alleges that Defendants violated his First Amendment free speech rights by removing him from the ESMD/Service Chief position in retaliation for statements which Kattar made regarding the treatment of Katherine I. To establish his retaliation claim, Kattar must show that his speech was protected by the Constitution and that the speech was a substantial or motivating factor in the adverse employment action. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); *Dambrot v. Central Mich. Univ.*, 55 F.3d 1177, 1186 (6th Cir.1995). Defendants will prevail if they can show that the same action would have been taken even in the absence of the protected speech. *See Dambrot*, 55 F.3d at 1186.

 Kattar's speech is entitled to protection only if it was a matter of public concern. *See Waters v. Churchill*, 511 U.S. 661, 668, 114 S.Ct. 1878, 1884, 128 L.Ed.2d 686 (1994). If the speech does not present a matter of public concern, the plaintiff's claim must be dismissed. However, even if a court concludes that the speech involved a matter of public concern, it must nonetheless balance "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Educ. of Township High Sch. Dist. 205, Will City*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734–35, 20 L.Ed.2d 811 (1968). "If the employee's free speech interests outweigh the efficiency interest of the government as employer, the employee's First Amendment rights have been violated." *Dambrot*, 55 F.3d at 1186.[8]

---

7. The heading on Count I also indicates that Kattar is alleging a violation of his right to substantive due process. The Court will treat that claim as abandoned because Kattar did not address it in his brief in response to Defendants' motion for summary judgment.

8. Although the frameworks adopted in *Mt. Healthy City Board of Education* and *Pickering* apply to First Amendment claims of governmental employees, both parties agree that Kattar's claim is governed by the same analysis even though Kattar was not an employee of TRAH. The Court can discern no reason for not applying the same test to Kattar, because even though he was not an employee, his status was similar to that of an employee in that many of the same workplace considerations that apply to governmental employees' free speech rights also apply to Kattar's role as a provider of services to TRAH through ECS and KEA. This application is consistent

The inquiry regarding whether speech addresses a matter of public concern is a question of law. *See Williams v. Kentucky,* 24 F.3d 1526, 1534 (6th Cir. 1994). "[M]atter[s] of political, social, or other concern to the community" are generally regarded as matters of public concern. *Connick v. Myers,* 461 U.S. 138, 146, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983). However, words alone do not establish the nature of the speech. The "content, form, and context of a given statement, as revealed by the whole record," must be considered in evaluating whether the plaintiff's speech was of concern to the public. *Id.* at 147–48, 103 S.Ct. at 1690. In a recent opinion addressing a government employee's free speech claim, the Sixth Circuit noted that

> [i]t is important ... to distinguish matters of public concern from internal office politics. Federal courts normally do not review personnel decisions reacting to an employee's behavior "when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters of only personal interest" ... *Jackson v. Leighton,* 168 F.3d 903, 909–10 (6th Cir.1999) (quoting *Connick,* 461 U.S. at 147, 103 S.Ct. at 1690).

Kattar's claim is based upon statements that he made to TRAH employees and administrators regarding Park's treatment of Katherine I. In several cases, courts have held that statements by health care providers regarding patient care involved matters of public concern. For example, in *Paradis v. Montrose Memorial Hospital,* 157 F.3d 815 (10th Cir.1998), the court held that complaints made by nurses to hospital administrators regarding a doctor's conduct, which included, among other things, treating patients based upon their ability to pay and practicing medicine without a license were "self-evidently" matters of concern to the public. *Id.* at

818. The Ninth Circuit in *Gillette v. Delmore,* 886 F.2d 1194 (9th Cir.1989), held that a fireman's comments to police officers, other firemen, and the fire captain regarding the manner in which police and firemen handled a call involving a person suspected of overdosing on drugs presented a matter of public concern even though the statements were not directed to the public at large. *See id.* at 1197–98. In an unreported decision, the Tenth Circuit held that a pharmacist's statements to a state pharmacy board regarding filling of prescriptions for prisoners at a county jail "appear[ed] to be matters of public concern because they indicate[d] possible improper medical treatment of county jail inmates and because there [was] a public interest in ensuring that pharmacies are operated in accordance with federal and state regulations." *Arnold v. Oklahoma County Bd. of County Comm'rs,* 77 F.3d 492, 1996 WL 84125, at *4 (10th Cir.1996). In *Teeters v. Scott,* 733 F.Supp. 1279 (E.D.Ark.1990) (mem.op.), the court held that a licensed psychiatric technician nurse's statements made to the mother of a patient regarding the quality of care being given to the patient constituted a matter of public concern. *See id.* at 1282–83. *See also DiMarco v. Rome Hosp. & Murphy Mem'l Hosp.,* No. 88–CV–1258, 1991 WL 336000, at *8 (N.D.N.Y. July 1, 1991) (mem.op.) (finding that physician's speech regarding his patients' well-being and general workings of the hospital were based upon physician's concern as a professional rather than his personal dissatisfaction and therefore presented matters of public concern).

Defendants argue that Kattar's statements did not involve a matter of public concern because Kattar made the statements in response to complaints that had been made about his performance as ESMD and the statements concerned in-

with the Supreme Court's recent decision in *Board of County Commissioners, Wabaunsee County, Kansas v. Umbehr,* 518 U.S. 668, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996), in which the Court found "no reason to believe that

proper application of the Pickering balancing test cannot accommodate the differences between employees and independent contractors." *Id.* at 678, 116 S.Ct. at 2349.

ternal hospital procedures in connection with an investigation of the care provided to Katherine I. Defendants contend that this case is factually similar to *Zaky v. United States Veterans Administration*, 793 F.2d 832 (7th Cir.1986), in which the court held that statements made by a physician regarding patient care were not entitled to protection under the First Amendment because they were made during the course of an internal process of determining the policy that the hospital would follow in delivering patient care. *See id.* at 838–39. In addition, the court found that statements were made to advance the physician's personal interest because "the majority of the statements were made in defense of the numerous complaints lodged against [the physician]...." *Id.* at 839.

The Court finds *Zaky* distinguishable from the case at bar because there is no evidence that Kattar's statements were made as part of an internal process of policy determination. Rather, the evidence shows that Kattar made the statements sometime in early February to TRAH's Risk Manager, Mary Kistler, and on March 10, to Dr. Latham of KEA, out of concern for whether proper care was given to the patient. (*See* Compl. ¶¶ 45, 47; Kattar Dep. at 121, Pl.'s Resp. Br. Ex. 7.) In addition, although Defendants contend that Kattar made the statements in response to criticisms about his performance as ESMD and after he was removed from that position, Kattar's evidence shows that his statements to Mary Kistler in early to mid-February were made prior to the time Solberg first made known his "serious concerns" about "Kattar's ability to function within [the] emergency department ... as the [ESMD]." (Letter from Solberg to Latham of 3/6/97, Solberg Aff. Ex. C, attached to Defs.' Br. Supp.) Furthermore, Kattar has shown that he made the statements prior to his removal from the ESMD position.

In order to show that TRAH's concerns with Kattar's performance had been made known to Kattar prior to the time Kattar made the statements, TRAH offers a memorandum dated March 11, 1996, from Dr. Robert Hill to Dr. Latham of KEA regarding the results of an evaluation of Kattar's performance as ESMD. Dr. Hill indicated that there were "concerns [about Kattar's] leadership ability, understanding the proper progression of implementing policies, interaction with the ED Manager and lack of participation on the Medical Control Board," but noted that Kattar's performance "[i]n all other areas" was "satisfactory." (Mem. from Hill to Latham of 3/11/96, Defs.' Reply Br. Ex. C.) As Defendants concede, the memorandum was written almost one year prior to the date Solberg raised his concerns about Kattar's performance. Defendants have not presented any evidence that the concerns identified in the March 11, 1996, memorandum were not addressed or that they still presented a serious issue in terms of Kattar's ability to perform his duties as ESMD at the time he made his statements in February 1997. Furthermore, Kattar has shown that on December 6, 1996—only a few months before Solberg demanded that Kattar resign—Kattar received a favorable evaluation from Dr. Latham which highlighted Kattar's abilities to "effectively interact with the medical staff members in general" and "investigat[e] physician issue and achiev[e] satisfactory resolutions to problems." (Letter from Latham to Kattar of 12/5/96, Pl.'s Resp. Br. Ex. 4.) Dr. Latham also informed Kattar that Solberg "indicated that [Kattar's] overall administrative performance ha[d] been good." (*Id.*) While the March 6, 1997, letter does show that TRAH had concerns with Kattar's performance at least as early as the beginning of March 1997, some of which might be considered to be the same concerns identified by Dr. Hill in his March 11, 1996, memorandum, the Court finds that a question of fact remains regarding whether Kattar's statements were made in response to such concerns.

The Court must also apply the *Pickering* balance test to determine whether TRAH's interest in delivering ef-

ficient services outweighed Kattar's interest in the speech. Those factors include:

> (1) the need for harmony in the office or work place; (2) whether the government's responsibilities require a close working relationship to exist between the plaintiff and co-workers when the speech in question has caused or could cause the relationship to deteriorate; (3) the time, manner, and place of speech; (4) the context in which the dispute arose; (5) the degree of public interest in the speech; and (6) whether the speech impeded the employee's ability to perform his or her duties.

*Roberts v. Van Buren Pub. Sch.*, 773 F.2d 949, 954 (8th Cir.1985) (quoting *Bowman v. Pulaski County Special Sch. Dist.*, 723 F.2d 640, 644 (8th Cir.1983)).

■■■ Because Defendants' arguments focused solely on the nature of the speech and not upon the *Pickering* balancing of competing interests, they have not presented any evidence specifically directed at the relevant factors. The Court has reviewed the evidence in the record to determine whether Kattar's speech impaired his ability to perform his duties or otherwise disrupted TRAH's ability to function effectively or deliver services in an efficient manner. Although the evidence shows that Kattar's statements regarding the care given to the patient may have caused some internal conflict in terms of how the issue should be addressed, the Court finds nothing which suggests that Kattar's comments were disruptive to TRAH's operations. *Cf. Jackson,* 168 F.3d at 912 (finding that medical college's

interest in efficient and effective administration of programs outweighed physician's interests where physician's comments "created internal conflict resulting in a departmental upheaval' "). Thus, the Court concludes that TRAH's interests did not outweigh Kattar's interest.

■■■ Defendants also contend that they are entitled to summary judgment because Kattar has failed to produce any evidence which shows that Kattar's speech regarding the treatment of the patient was a substantial or motivating factor in the decision to remove him from the ESMD position. Defendants contend that Kattar was removed from the position for reasons unrelated to his comments. However, the Court finds that Kattar has presented sufficient evidence to create a genuine issue of material fact regarding the reason for Kattar's removal from the ESMD position. Although Defendants have shown that concerns were raised about Kattar's performance almost a year prior to his removal, Kattar has shown that a more recent evaluation indicated that Kattar was doing a satisfactory job and that TRAH, and in particular, Solberg, thought that Kattar's "overall administrative performance ha[d] been good." In addition, Solberg's criticisms of Kattar's performance came after Kattar first commented upon Park's treatment of the patient. Thus, a reasonable person could conclude that Kattar was removed because of his comments.[9]

### C. Other Claims

The Court will dismiss Kattar's claim in Count V for conspiracy to violate his civil

---

**9.** In their reply brief, Defendants raised for the first time the issue of whether TRAH can be held liable for Solberg's acts because Kattar is apparently attempting to assert liability against TRAH on the basis of respondeat superior. Although Defendants are correct that a municipal entity may not be held liable under a theory of respondeat superior, *see Monell v. Department of Social Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), Solberg, as the President and CEO of TRAH, clearly had the authority to establish and carry out policy decisions on behalf of TRAH. *See Malak v. Associated Physicians,*

*Inc.,* 784 F.2d 277, 283 (7th Cir.1986) (stating that defendant, who acted as chief executive officer of hospital, was a "policymaker whose conduct [was] in effect that of the governmental entity"). Furthermore, the letter in which Solberg requested Kattar's removal shows that a copy was sent to Robert McDonough, the Authority Board Chairman. It thus appears that Solberg likely acted in conjunction with, or at the request of, the hospital's board. Thus, Kattar's claim against TRAH based upon Solberg's conduct does not depend upon respondeat superior liability.

rights under federal and state law as Kattar has conceded that dismissal of that claim is proper in light of the dismissal of KEA and Dr. Latham as defendants.

## II. State Law Claims

### A. Tortious Interference

 In Count III, Kattar alleges a claim for tortious interference with business relationship. Specifically, Kattar claims that TRAH, Solberg, and Park intentionally interfered with his relationship with KEA by causing KEA to terminate the KEA/Kattar, P.C. Agreement.[10] (*See* Compl. ¶¶ 73–76.) To prove a tortious interference claim, a plaintiff must show that: (i) he had a valid business relationship; (ii) the defendant knew of the business relationship; (iii) the defendant intentionally interfered with and caused a breach of the relationship; and (iv) he suffered damage as a result of the termination of the relationship. *Michigan Podiatric Med. Ass'n v. National Foot Care Program, Inc.,* 175 Mich.App. 723, 735, 438 N.W.2d 349, 354 (1989). In addition, a plaintiff must allege either "the intentional doing of a per se wrongful act or the doing of a lawful act with malice and unjustified in law for the purpose of invading the contractual rights or business relationship of another." *Feldman v. Green,* 138 Mich. App. 360, 378, 360 N.W.2d 881, 891 (1984) (per curiam). Where the plaintiff relies upon lawful acts, he "must demonstrate, with specificity, affirmative acts by the interferor which corroborate the unlawful purpose of the interference." *Id.* at 369–70, 360 N.W.2d at 886.

 Kattar's claim, as set forth in his brief in response to Defendants' motion, is that Solberg acted for his and Park's benefit when Solberg sent his June 19, 1997, memorandum to Dr. Latham requesting Kattar's immediate removal from service at TRAH based upon "recent concerns regarding patient care...." (Mem. from

Solberg to Latham of 6/19/97, Pl.'s Resp. Br. Ex. 13.) Specifically, Kattar alleges that Solberg and Park sought to have Kattar removed from TRAH in order to cover up Park's failure to remove a surgical sponge from Katherine I and to prevent Kattar from further disclosing his views on the improper treatment rendered to Katherine I.

Based upon the record, the Court finds that Kattar has failed to show that either Solberg or Park intentionally committed a wrongful act or a lawful act with malice and unjustified in law for the purpose of interfering with Kattar's relationship with KEA. Although Kattar alleges that Solberg acted outside the scope of his responsibilities as CEO of TRAH in sending the June 19, 1997, memorandum to Dr. Latham requesting that Kattar be immediately removed from service at TRAH, there is no evidence which shows that Solberg or Park were acting for their own personal benefit and not to further the interests of TRAH.

Kattar attempts to show that Solberg and Park acted with an improper purpose, namely, to silence Kattar regarding the Katherine I incident, by presenting evidence of an incident involving Kattar and Park regarding patient care in which Park threatened that he would take steps to prevent Kattar from obtaining privileges at other hospitals. (*See* Risk Management Report of 6/19/97, Pl.'s Resp. Br. Ex. 14.) Even if Solberg sent the memorandum because of the incident between Kattar and Park, the evidence does not give rise to an inference that Solberg's request to remove Kattar had anything to do with the Katherine I incident. It is undisputed that Kattar's statements regarding the Katherine I incident were made in February and March, 1997, but Kattar was permitted to remain on staff for three months after he was removed as ESMD. Kattar

---

10. Kattar alleges in paragraph 75 of his complaint that Defendants caused the June 5, 1997 termination of the KEA/Kattar, P.C. relationship. The Court understands the June 5, 1997, date as actually intended as June 19, 1997, as there is no evidence in the record which relates to a June 5, 1997, termination of the KEA/Kattar, P.C. Agreement.

has not offered any evidence to show that he made any statements during that period regarding the Katherine I incident or that Solberg or Park made any statements to him during that period from which it could be inferred that Solberg's June 19, 1997, request was connected in any way to the Katherine I incident. Therefore, Defendants are entitled to summary judgment on Kattar's tortious interference claim.[11]

## B. Intentional Infliction of Emotional Distress

 In Count VI of his complaint Kattar alleges a claim for intentional infliction of emotional distress. The Sixth Circuit recently addressed a claim for intentional infliction of emotional distress under Michigan law in *Andrews v. Prudential Securities, Inc.,* 160 F.3d 304 (6th Cir. 1998). In *Andrews,* the court stated that while the Michigan Supreme Court has not recognized the tort of intentional infliction of emotional distress, the Sixth Circuit has assumed in previous opinions that the Michigan Supreme Court would recognize the tort. *See id.* at 309. The Andrews court summarized the proof required to sustain a claim of intentional infliction of emotional distress as follows:

> To establish a prima facie case of intentional infliction of emotional distress, a plaintiff must establish four elements: (1) extreme and outrageous conduct; (2) intent or recklessness; (3) causation; and (4) severe emotional distress. The outrageous conduct requirement is satisfied only by conduct that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Lia-

bility arises, moreover, only "where the distress inflicted is so severe that no reasonable man could be expected to endure it."

*Id.* (citations omitted) (quoting *Roberts v. Auto–Owners Ins. Co.,* 422 Mich. 594, 608–09, 374 N.W.2d 905, 908–09 (1985)).

 The Court finds that Defendants are entitled to summary judgment on Kattar's emotional distress claim because Defendants' conduct was not sufficiently outrageous as a matter of law. The conduct alleged cannot be characterized as the type of conduct require to "satisf[y] the strict standard for establishing the tort" of intentional infliction of emotional distress. *Hartleip v. McNeilab, Inc.,* 83 F.3d 767, 777 (6th Cir.1996) (holding that the conduct of the plaintiff's co-worker in threatening her employment stability, applying pressure on her to engage in a non-business relationship, constantly calling and writing to her, and discussing his sexual fantasies about her with other employees was insufficient conduct to support an emotional distress claim); *see also Norris v. State Farm Fire & Cas. Co.,* 229 Mich. App. 231, 240, 581 N.W.2d 746, 750 (1998) (holding that the plaintiff who asserted discrimination claim against her former employer failed to show that the employer's conduct was sufficiently extreme and outrageous); *Meek v. Michigan Bell Tel. Co.,* 193 Mich.App. 340, 346–47, 483 N.W.2d 407, 410 (1991) (per curiam) (holding that the plaintiff's allegations that she was harassed by her supervisor on the basis of her gender and religion did not constitute extreme and outrageous conduct). In addition, although Kattar claims that he was upset by Park's comments during the June 19, 1997, incident, Kattar has failed to produce any evidence that he

11. Defendants also contend that they cannot be held liable on a tortious interference claim because KEA actually terminated the KEA/Kattar, P.C. Agreement effective July 16, 1997, by letter dated April 15, 1997. Thus, Kattar's relationship with KEA was to terminate less than one month after the date Solberg sent his memorandum to Dr. Latham.

Because the Court has found that Kattar has failed to show that Solberg and Park engaged in a lawful act with malice and unjustified in law, the Court need not determine whether the impending termination of the KEA/Kattar, P.C. Agreement precludes a tortious interference claim.

suffered severe emotional distress in any form as a result of the alleged conduct. Therefore, summary judgment will be granted on Count VI.

### C. Retaliatory Discharge In Violation of Public Policy

■ The Court will also grant summary judgment on Count IV, which alleges a claim of retaliatory discharge in violation of public policy because Kattar has failed to allege or prove any set of facts that could give rise to such a claim under the Michigan Supreme Court's decision in *Suchodolski v. Michigan Consolidated Gas Co.*, 412 Mich. 692, 316 N.W.2d 710 (1982).[12]

### Conclusion

For the foregoing reasons, the Court will grant Defendants' Motion for Summary Judgment on all claims except Kattar's First Amendment claim under Count II.

An Order consistent with this Opinion will be entered.

### ORDER

In accordance with the Opinion filed on this date,

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment (docket no. 33) is **GRANTED IN PART.** Counts I, and III through VI are **DISMISSED WITH PREJUDICE.**

This case will continue only as to Count II.

---

12. Defendants also contend that Kattar's settlement with KEA and Dr. Latham release them from all claims. The Court rejects this argument because Defendants were not vicariously liable for the acts of KEA and Dr. Latham or vice versa. *See Theophelis v. Lansing Gen. Hosp.*, 430 Mich. 473, 480, 424 N.W.2d 478, 481 (1988). Moreover, neither KEA nor Dr. Latham could be liable for TRAH's alleged violation of Kattar's First Amendment rights because they are not state actors.