W. Thomas JACKSON, M.D.,
Plaintiff–Appellant,

v.

Richard LEIGHTON, et al.,
Defendants–Appellees.

No. 97–4393.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 29, 1998.

Decided Feb. 22, 1999.

Keith J. Watkins (argued and briefed), Jones & Bahret Co., L.P.A., Toledo, OH, for Plaintiff–Appellant.

John M. Carey (briefed), Robert W. Bohmer (briefed), R. Kent Murphree (argued and briefed), Watkins, Bates & Carey, Toledo, OH, for Defendants–Appellees.

Before: DAUGHTREY and MOORE, Circuit Judges; COHN, District Judge.*

COHN, D.J., delivered the opinion of the court, in which DAUGHTREY, J., joined. MOORE, J. (pp. 912–13), delivered a separate opinion concurring in the result.

* The Honorable Avern Cohn, United States District Judge for the Eastern District of Michigan, sitting by designation.

## OPINION

COHN, District Judge.

Plaintiff-appellant W. Thomas Jackson (Jackson), former Chairman of the Department of Orthopedic Surgery at the Medical College of Ohio (MCO), claims his chairmanship was not renewed in retaliation for exercising his rights protected under the First Amendment to the United States Constitution. 42 U.S.C. § 1983. Jackson appeals the decision of a magistrate judge granting summary judgment in favor of defendants Richard Leighton, M.D. (Leighton), Roger Bone, M.D. (Bone), and MCO (collectively referred to as "defendants"). The magistrate judge found that although Jackson's speech was a matter of public concern worthy of First Amendment protection, there was no evidence that the protected speech was "a substantial motivating factor" in the non-renewal decision. Thus, the magistrate judge held that defendants were entitled to summary judgment on qualified immunity grounds. We affirm, though for somewhat different reasons.

### I.

Jackson joined the faculty at MCO as an associate professor in 1983. Jackson was granted tenure and was appointed Chairman of the Department of Orthopedic Surgery at MCO in 1988. As chairman, Jackson was responsible for selection, development, promotion, and discipline of faculty, and for setting the goals and policies of the department. Chairmanships at MCO last one year, though the Board of Trustees of MCO may renew the positions. Typically, the positions were renewed upon the recommendation of the Dean of the School of Medicine and concurrence of the President of MCO. Jackson's chairmanship was renewed annually until 1995.

MCO was created by the Ohio General Assembly, see Ohio Rev.Code Ann. § 3350.01, and is an arm of the State of Ohio, see Hall v. Medical College of Ohio,

742 F.2d 299, 307 (6th Cir.1984). Bone became President and Chief Executive Officer of MCO in 1993.[1] Bone was generally responsible for administration of affairs at MCO; he envisioned his administration as "an administration of change" to prepare for "the challenges and opportunities of the 21st Century." Bone perceived Jackson as inflexible and generally opposed to change. Leighton, the Dean of the School of Medicine at MCO during the relevant times, was in charge of determining and coordinating academic programs at MCO.[2]

Jackson asserts that he was outspoken in his opposition to two proposals by Bone: a merger of MCO with Toledo Hospital, and the appointment of Dr. Wassef Mikhail (Mikhail), an orthopedic surgeon, to be director of a joint diseases institute. Bone testified Jackson was terminated as chairman due to the internal conflict in conjunction with the hiring of Mikhail.

### A.

In early 1994, Bone supported a proposal for a merger of MCO with Toledo Hospital (merger proposal). The Board of Trustees authorized Bone to negotiate the merger. Bone made it very clear that he would not tolerate dissent or opposition to the merger proposal, and that he did not need input from the department chairs. The merger proposal, however, irked many associated with MCO, including Leighton, the faculty, the employees' union, and a number of department chairs. Dr. Frank McCullough, acting President of MCO in 1996, stated that the merger would have been a sale of the "heart and soul" of MCO, and would ultimately lead to its closure.

Jackson also was opposed to the merger. In April 1994, Jackson discussed the merger with physicians at MCO and Toledo Hospital, opining that "elements of the proposal were flawed." In June 1994, Jackson says he de-

---

1. Bone is now deceased.

2. Jackson sued Bone and Leighton in their individual and official capacities. Jackson does not appeal the grant of summary judgment on his

claim for money damages against Bone and Leighton in their official capacities and MCO, which were dismissed pursuant to the Eleventh Amendment.

livered written criticism[3] of the merger to each member of an executive committee.[4] In October 1994, Leighton advised Jackson to be more discreet because Bone was displeased with his comments.

Defendants note that Jackson did not speak directly to Bone or the Board of Trustees in opposing the merger, and that Jackson did not have a reputation as being particularly outspoken regarding the merger. According to Bone, "there were many people who were far more outspoken than Dr. Jackson." It appears that Jackson did not speak out in opposition to the merger other than in April and June 1994, and the record is silent as to what Jackson actually said in expressing his opposition to the merger. Defendants, however, have not disputed the fact that Jackson expressed his opposition to the merger on these two occasions.

The Ohio General Assembly refused to support the merger proposal by early June of 1994.[5] On July 1, 1994, Jackson was reappointed as Chairman of the Department of Orthopedic Surgery based upon the recommendation of Leighton and the concurrence of Bone.

After the merger proposal failed, Bone proposed to transfer MCO's pediatric services to Toledo Hospital in exchange for $4,000,000 from ProMedica (ProMedica proposal).[6] At a December 19, 1994 meeting of the department chairs, which Leighton attended, Jackson says he spoke strongly against the ProMedica proposal and urged that a letter be sent to Bone and the Board of Trustees recommending that the proposal be rejected and Bone be replaced. Later the same day, Bone called a meeting of the same group. Bone expressed his anger and stated that he would not send the letter on to the Board of Trustees; Bone thought he would be fired if the letter reached the Board of Trustees. At a meeting of the Board of Trustees on December 30, 1994, which Bone attended, Jackson argued that the ProMedi-

ca proposal be rejected or limited. The Board of Trustees nevertheless approved the agreement.

## B.

Jackson also was opposed to a proposal to appoint Mikhail as director of a newly created "Center for Excellence for Joint Replacement and Revision," a joint diseases institute to be endowed by charitable donors to MCO (Mikhail proposal). According to Jackson, the proposal provided that Mikhail was to be given: directorship of the program, without a search; a full-tenured professorship; and more space and resources than other faculty. Specifically, Jackson testified as follows:

> I bear no hard feelings or ill will to Dr. Mikhail but this proposal, as I saw it, would jeopardize my department because number one, in his initial demand he was to get 2,500 square feet of appropriately furnished office space. My entire department occupies about 1,300 square feet at the Medical College of Ohio, maybe less. Number two, he would jump over valuable members of my faculty who have worked very hard to get their careers to the point where they are. They have to do the academic pursuit, they have to do teaching, do the research to gain any advancement at all, but this guy comes in from the outside and leapfrogs over them to a tenured full professorship. That was going to be a very difficult thing to sell to my department. I did feel that it was doable in time but a lot has to be accomplished to make that happen and that's all that I told the people.

Jackson represents that Mikhail effectively purchased the position because Mikhail promised annual endowment contributions of $85,000 for ten years. Jackson thought that the institute was bound for financial failure because the level of endowment was insuffi-

---

3.  The written criticism is not part of the record.

4.  Jackson says the executive committee consisted of "the leadership of the college."

5.  Jackson testified that the date was early June 1994, although Dr. McCullough testified that the

date was April 1994. No evidence of legislative action was furnished by the parties.

6.  The nature of ProMedica's affiliation with Toledo Hospital is not clear from the record.

cient. Jackson also believed the proposal lacked "academic integrity."[7]

On November 29, 1994, Leighton advised Jackson that Bone was going to announce the Mikhail proposal in the near future. Leighton urged Jackson to write a letter supporting the promotion of Mikhail to full professor with tenure. Though Jackson told Leighton he did not approve in granting Mikhail tenure, Jackson wrote the letter nonetheless.[8] On December 15, 1994, Leighton and Jackson met with Mikhail to discuss alternative proposals. Jackson suggested that Mikhail be appointed to the volunteer faculty. Mikhail disagreed and refused to allow the proposal to be announced.

Jackson again met with Leighton on January 3, 1995. Leighton stated that Bone wanted to announce the proposal at a board meeting on January 23, 1995. Jackson says Leighton indicated that the proposal now included Jackson's recommendation that Mikhail be appointed without tenure. Proceeding under this assumption, Jackson and his faculty recommended the appointment of Mikhail the following day. Immediately thereafter, however, Leighton told Jackson that Mikhail's appointment would be with tenure in the "academic series." After Jackson stated that he and his faculty would not support the appointment, Leighton told Jackson that: "[H]e had been holding Dr. Bone off from firing [Jackson], but that this would be the last straw, and if [Jackson] refused the requested support he would be fired." The following day, January 5, 1995, Leighton advised Jackson that his contract as Chairman of the Department of Orthopedic Surgery would not be renewed. Leighton requested that Jackson remain in the position until replaced.

Bone testified in deposition that the recommendation of non-renewal was a result of Jackson's mismanagement in conjunction with the hiring of Mikhail, which created internal conflict resulting in a "departmental upheaval." More generally, Bone stated that "it was not Dr. Jackson's *speech* that I minded so much as his stubborn, inflexible, narrow-minded and unconstructive approach to change." Jackson asserts that he did not receive a negative evaluation of his job performance by defendants. In an August 1994 self-assessment, however, Jackson opined that he was "relatively ineffective in pushing forward the goals of the Department and in gaining access to institutional resources needed for Departmental and personal growth and progress," and that "the Department of Orthopedic Surgery would benefit from a change in leadership, or, at the least, improvement in support of the existing leadership." Jackson remained as chairman until June 30, 1997, and he remains a tenured member of the MCO faculty.[9]

## II.

Jackson claims that his chairmanship was not renewed in retaliation for exercising his First Amendment rights. On appeal, Jackson argues that the magistrate judge erred in granting summary judgment on qualified immunity grounds. The magistrate judge found that all of Jackson's comments noted above were related to matters of public concern, although the comments were not "the substantial motivating factor" in the non-renewal decision. The magistrate judge concluded that defendants were entitled to qualified immunity because "defendants could have reasonably believed that they were acting within constitutional limits by recommending non-renewal of plaintiff's position as chairperson."

---

7. In an affidavit, Jackson says that in July 1994 he "questioned" the Mikhail proposal and "expressed his view" that the proposal was doomed financially. It is not clear to whom, if anyone, Jackson expressed his opinions, or whether Bone or Leighton were aware of these remarks.

8. Defendants point out that Jackson was the only member of the Department of Orthopedic Surgery who did not sign a letter to Bone expressing criticism of the Mikhail proposal.

9. Jackson's claim that he had a tenure right in his chairmanship was rejected by the Court of Appeals of Ohio. *See Jackson v. Medical College of Ohio*, No. L–95–255, 1997 WL 221032, at *6 (Ohio Ct.App. Apr. 25, 1997). The Court of Appeals of Ohio also held that Jackson could not be removed as chairman until June 30, 1996, due to the notice requirements in the MCO Bylaws, Rules and Regulations. *Id.* at *8.

## A.

We review a grant of summary judgment *de novo. See EEOC v. University of Detroit,* 904 F.2d 331, 334 (6th Cir.1990). As the non-moving party, Jackson must "set forth specific facts showing that there is a genuine issue for trial" to defeat the motion for summary judgment. Fed.R.Civ.P. 56(e). We view the facts and inferences drawn therefrom in the light most favorable to Jackson. *Huffman v. United States,* 82 F.3d 703, 705 (6th Cir.1996) (citing *Michigan United Food and Commercial Workers Unions v. Muir Co.,* 992 F.2d 594, 597 (6th Cir.1993)).

■ Under the doctrine of qualified immunity, government officials engaged in discretionary functions are generally "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). A defendant is not entitled to qualified immunity if the plaintiff asserts a violation of a known civil constitutional right, and "the constitutional right was so clearly established at the time in question that a reasonable official in the defendant's position would have known that he was violating the plaintiff's constitutional rights." *Hutsell v. Sayre,* 5 F.3d 996, 1003 (6th Cir.1993), *cert. denied,* 510 U.S. 1119, 114 S.Ct. 1071, 127 L.Ed.2d 389 (1994).

Before examining the reasonableness of defendants' conduct in light of a clearly established constitutional right, however, we must determine whether Jackson has made out a claim for violation of his constitutional rights at all. *See Siegert v. Gilley,* 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991) ("A necessary concomitant to the determination of whether the constitutional right asserted by a plaintiff is 'clearly established' at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all."); *Blair v. Meade,* 76 F.3d 97, 100 (6th Cir.1996) ("Only after the court makes this determination does it consider whether this right was clearly established.") (citing *Siegert,* 500 U.S. at 231–235, 111 S.Ct. 1789).

## B.

■ To establish a constitutional violation in this context, a public employee must demonstrate that his or her speech was constitutionally protected and that such speech was a substantial or motivating factor in the termination. *Board of County Comm'rs, Wabaunsee County, Kan. v. Umbehr,* 518 U.S. 668, 675, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996). If an employee does so, the government can nonetheless avoid liability "by showing that it would have taken the same action even in the absence of the protected conduct." *Id.* (citing *Mt. Healthy City Bd. of Ed. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)).

■ Jackson must pass the balancing test first set forth in *Pickering v. Board of Ed. of Township High School Dist. 205, Will Cty.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), to establish that his speech was constitutionally protected. In particular, Jackson must show that his speech related to a matter of public concern, and his "interest in expressing [himself] on this matter must not be outweighed by any injury the speech could cause to the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Waters v. Churchill,* 511 U.S. 661, 668, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994) (plurality opinion) (quoting *Connick v. Myers,* 461 U.S. 138, 142, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) (quoting *Pickering,* 391 U.S. at 568, 88 S.Ct. 1731)) (internal quotation marks omitted).

■ In general, a matter of public concern is a "matter of political, social, or other concern to the community." *Connick,* 461 U.S. at 146, 103 S.Ct. 1684. It is important, however, to distinguish matters of public concern from internal office politics. Federal courts normally do not review personnel decisions reacting to an employee's behavior "when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters of only personal interest," *Connick,* 461 U.S. at 147, 103 S.Ct. 1684. "The mere fact that public monies and government efficiency are related to the subject of a public employee's speech

do[es] not, by [itself], qualify that speech as being addressed to a matter of public concern." *Barnes v. McDowell*, 848 F.2d 725, 734 (6th Cir.1988). If the speech is not related to a matter of public concern, we do not evaluate the reasons for the decision. As explained by the Supreme Court:

> When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment. Perhaps the government employer's dismissal of the worker may not be fair, but ordinary dismissals from government service which violate no fixed tenure or applicable statute or regulation are not subject to judicial review even if the reasons for the dismissal are alleged to be mistaken or unreasonable.

*Connick*, 461 U.S. at 146, 103 S.Ct. 1684 (citations omitted). To determine whether the speech involves a matter of public concern, we look to the content, form, and context of the statements in light of the record as a whole. *Id.* at 147–48, 103 S.Ct. 1684.

▇▇▇▇ Even if speech addresses a matter of public concern, however, "termination because of protected speech may be justified when legitimate countervailing government interests are sufficiently strong." *Umbehr*, 518 U.S. at 675, 116 S.Ct. 2342. The employee's interest must be balanced with the government's interest as an employer in maintaining an effective and efficient organization; the government need not "allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action." *Connick*, 461 U.S. at 151–52, 103 S.Ct. 1684. Indeed, "[t]he government's interest in achieving its goals as effectively and efficiently as possible is elevated from a

relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer." *Waters*, 511 U.S. at 675, 114 S.Ct. 1878.

## C.

### 1.

▇▇▇▇ Jackson's comments regarding the merger proposal addressed a matter of public concern.[10] The merger proposal threatened the very existence of MCO, a state-funded college created by the Ohio General Assembly. Presumably, the Ohio General Assembly welcomed commentary on the proposed merger, as it was ultimately responsible for the fate of the merger. Further, the continued existence of MCO was important to the locality due to the fact that MCO provides health care to area residents. *Cf. U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia*, 898 F.2d 914, 937 (3d Cir.1990) ("quality, availability, and cost of health care are among the most important and debated issues of our time"). It is therefore fair to state that Jackson's comments in opposing the merger related to a "matter of political, social, or other concern to the community." *Connick*, 461 U.S. at 146, 103 S.Ct. 1684. *See also Rahn v. Drake Center*, 31 F.3d 407, 415 (noting matters that "certainly were extremely important to the locality" were "thus worthy of First Amendment protection") (Keith, J., dissenting). In other words, Jackson's comments regarding the merger proposal were more than on a matter of personal interest or internal office politics.

▇▇▇▇ In contrast, Jackson's statements opposing the ProMedica proposal did not address a matter of public concern. There is nothing in the record to indicate that the ProMedica proposal threatened the existence of MCO or even the provision of pediatric health care in the locality. Jackson's argu-

---

10. It is difficult to examine the content, form, and context of any of Jackson's comments because it is not entirely clear from the record exactly what Jackson said and to whom he said it. Due to Jackson's failure to develop the record, we could dismiss his claim out of hand. *See* Fed.R.Civ.P. 56(e) ("the adverse party's response ... must set forth specific facts showing that there is a genuine issue for trial"). *Cf. Chappel v.*

*Montgomery County Fire Protection Dist. No. 1*, 131 F.3d 564, 567 (6th Cir.1997) ("Regrettably, in order to explain adequately our reasoning with regard to the multiple issues raised on this appeal [of a denial of qualified immunity in a retaliation case under the First Amendment], we must burden the opinion with an extensive recitation of the relevant facts.") For the sake of completeness, however, we will indulge Jackson.

ment that a letter be sent to the Board of Trustees declaring the lack of confidence with Bone was nothing more than an example of the "quintessential employee beef" of incompetent management. *Barnes,* 848 F.2d at 735 (quoting *Murray v. Gardner,* 741 F.2d 434, 438 (D.C.Cir.1984)).

■ Similarly, Jackson's comments regarding the Mikhail proposal also involved internal office politics. The record reveals that Jackson only spoke out on whether Mikhail would be granted tenure. In particular, Jackson's only statements against the Mikhail proposal were as follows: on November 29, 1994, Jackson told Leighton he did not approve in granting Mikhail tenure, though he wrote a letter in support of Mikhail the next day; on December 15, 1994, Jackson met with Leighton and Mikhail to discuss Jackson's proposal that Mikhail be appointed to the volunteer faculty; and on January 3–4, 1995, when Jackson says that after he was deceived into thinking Mikhail would be appointed to the volunteer faculty, he told Leighton that he and his faculty would not support Mikhail's appointment to full professor with tenure. Jackson testified that his primary concern was how he would justify Mikhail's appointment to full professor with tenure to his department, given that Mikhail came "in from the outside and leapfrog[ged] over them," and that Mikhail's department would have about twice as much office space as Jackson's department. *See Chappel v. Montgomery County Fire Protection Dist. No. 1,* 131 F.3d 564, 576 (6th Cir.1997) (" '[t]he motive which underlies an employee's statements is a relevant, but not necessarily dispositive factor' when considering when an employees statements may be fairly characterized as relating to any matter of political, social, or other concern to the community") (quoting *Cliff v. Board of Sch. Comm'rs of Indianapolis, Indiana,* 42 F.3d 403, 409 (7th Cir.1994)). The squabble over Mikhail's tenure and office space, though undoubtedly important to Mikhail and ostensibly important to Jackson, can hardly be considered important to members of society.

*See id.* ("[A] public employee's complaint that a coworker spends too much time at the water cooler does not become a matter of public concern simply because that coworker is paid by the state.").[11]

Jackson's comments regarding the ProMedica and Mikhail proposals, therefore, cannot be the basis for a First Amendment claim because he spoke "as an employee on matters only of personal interest" rather than "as a citizen upon matters of public concern." *Connick,* 461 U.S. at 147, 103 S.Ct. 1684. Indeed:

> To presume that all matters which transpire within a government office are of public concern would mean that virtually every remark—and certainly every criticism directed at a public official—would plant the seed of a constitutional case. While as a matter of good judgment, public officials should be receptive to constructive criticism offered by their employees, the First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs.

*Id.* at 149, 103 S.Ct. 1684.

### 2.

■ Jackson's interest in commenting on the merger proposal, which was a matter of public concern, must be balanced with the interest of defendants in effectively leading MCO. "Although such particularized balancing is difficult, [we] must reach the most appropriate possible balance of the competing interests." *Connick,* 461 U.S. at 150, 103 S.Ct. 1684. We find that defendants' interests outweighed any interest of Jackson. Bone, who saw himself as an agent of change, aggressively pursued a series of proposals in order to improve MCO. Bone was met with opposition by Jackson on the three proposals noted above, and Jackson expressed interest in recommending that Bone be removed by the Board of Trustees. By his own account, Jackson was a fairly ineffective leader; he

---

**11.** Due to the sparsity of the circumstances surrounding Jackson's July 1994 comments regarding the Mikhail proposal, the record does not support a claim that the non-renewal decision was made in retaliation for Jackson's speech in opposition to the creation of the joint diseases institute.

admitted that his department "would benefit from a change in leadership." Jackson has not disputed that his opposition to the Mikhail proposal created internal conflict resulting in a "departmental upheaval." It was certainly reasonable, therefore, for Bone and Leighton to conclude that it was in the best interests of MCO not to renew Jackson's chairmanship. "When close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate." *Connick,* 461 U.S. at 151–52, 103 S.Ct. 1684. Such discretion is necessary because "[p]rolonged retention of a disruptive or otherwise unsatisfactory employee can adversely affect discipline and morale in the work place, foster disharmony, and ultimately impair the efficiency of an office or agency." *Arnett v. Kennedy,* 416 U.S. 134, 168, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974) (Powell, J., concurring). Defendants need not "tolerate action which [they] reasonably believed would disrupt the office, undermine [their] authority, and destroy close working relationships." *Connick,* 461 U.S. at 154, 103 S.Ct. 1684. Accordingly, because Jackson's interest was outweighed by the interests of defendants, Jackson has not established that defendants violated his First Amendment rights.

### D.

■ Moreover, even if we found Jackson's interest in commenting on the merger outweighed defendants' interest in deciding not to renew his chairmanship, the record does not support the proposition that Jackson's comments regarding the merger proposal were a substantial or motivating factor in the decision not to renew his chairmanship. The merger proposal was defeated by early June of 1994.[12] Although Bone led the charge with regard to the merger proposal and abhorred dissent, he concurred in renewing Jackson's chairmanship as of July 1, 1994. Given that Jackson was not particularly outspoken to the merger proposal, as well as the sequence of events immediately preceding the decision not to renew the chair-

manship, we conclude that Jackson's statements in opposition to the merger proposal were not a substantial or motivating factor in the decision. If Jackson's opposition to the merger proposal was a substantial or motivating factor in the decision not to renew his chairmanship, it seems that the decision would have been made upon the first opportunity to do so rather than over six months after the merger proposal had been defeated.

### III.

Contrary to Jackson's assertion, his claims for injunctive relief were not dismissed on Eleventh Amendment grounds; the magistrate judge stated that "*to the extent that Plaintiff's complaint seeks any monetary relief* against the Medical College of Ohio at Toledo, summary judgment for Defendants is proper under the Eleventh Amendment." (Emphasis added). Jackson's claim for injunctive relief is effectively a request for reinstatement on the grounds that defendants retaliated against him for exercising his constitutional rights. Because Jackson's constitutional claim lacks merit for the reasons stated above, there is no basis on which to grant him injunctive relief. *See, e.g., Hall,* 742 F.2d at 310.

### IV.

For the foregoing reasons, Jackson has not established that defendants violated his constitutional rights in failing to renew his chairmanship. Because defendants' interests in effectively and efficiently leading MCO outweighed Jackson's interest in commenting on the merger proposal, Jackson's comments were not constitutionally protected. Defendants therefore are entitled to summary judgment.

AFFIRMED.

MOORE, Circuit Judge, concurring in the result.

I concur in the result reached by the majority. I would affirm solely for the reasons stated in Part II.D. of the majority opinion.

---

12. It is reasonable to assume that Jackson offered the written criticism in June 1994 prior to the time the merger proposal was defeated.

Jackson failed to meet his burden of pointing to evidence showing that his protected speech was a substantial and motivating factor in the non-renewal decision.