Joe **CORRY, John Bowles, Don Rabold, and Simon L. Leis Defendants–Appellants,**

No. 00–3398.

United States Court of Appeals, Sixth Circuit.

April 3, 2001.

**William GRATSCH, Plaintiff–Appellee,**

v.

**HAMILTON COUNTY, Defendant,**

194

Before DAUGHTREY and GILMAN, Circuit Judges; and COLLIER, District Judge.*

CURTIS L. COLLIER, District Judge.

William Gratsch, a former Special Deputy with the Hamilton County Sheriff's Department ("HCSD"), brought suit against Hamilton County, Ohio, Joe Corry, John Bowles, Don Rabold, and Simon L. Leis, arguing he was terminated in retaliation for exercise of his First Amendment rights and without being accorded his procedural Due Process rights, all in violation of 42 U.S.C. § 1983. Gratsch also asserted various other Ohio state law claims. Hamilton County filed a motion for summary judgment which was granted by the district court. The individual Defendants also filed motions for summary judgment, arguing first that Gratsch had failed to present

* The Honorable Curtis L. Collier, United States District Judge for the Eastern District of Tennessee, sitting by designation.

evidence of a constitutional violation, and in the alternative, that even if Gratsch had established a factual basis for his claims, they were entitled to qualified immunity. The district court denied their motions, and the individual Defendants filed this interlocutory appeal. Gratsch filed a motion to dismiss the appeal for lack of subject matter jurisdiction. For the reasons set forth below, we DENY Gratsch's motion to dismiss, and AFFIRM IN PART and REVERSE IN PART the judgment of the district court and REMAND the case for further proceedings consistent with this opinion.

## II. BACKGROUND

### A. Factual background

From 1983 until 1996, Plaintiff–Appellee William Gratsch was a Hamilton County Special Deputy. Special deputies are commissioned by the Hamilton County Sheriff. During all times relevant to this action, Defendant–Appellant Simon Leis acted as the Hamilton County Sheriff. The Sheriff issues special deputy commissions pursuant to the same statutory authority that grants him power to issue "regular" deputy commissions. The special deputies for Hamilton County are organized into four units. Special deputies primarily provide law enforcement services to private individuals and organizations at places such as Coney Island, River Downs, church festivals and high school sporting events. These jobs are known as "private duty details." While the special deputies are on duty, they have full power of arrest. They have all the authority of regular deputies to act on "behalf of the sheriff." They are also governed by the same rules and regulations regarding personal conduct and appearance that apply to regular deputies. Defendant–Appellant Leis, as the Hamilton County Sheriff, had complete discretion over who would receive special deputy

commissions and when the special deputies would work.

Special deputies are not considered to be employees of Hamilton County. The private employers for whom they work detail determine when a particular detail begins and ends, and which duties to assign each special deputy. They are paid for working private duty details out of private funds. In some cases, special deputies are paid in cash by the private employer. In others, the private employer pays a non-profit corporation, such as the "Eastern Hamilton County Special Deputy Sheriff's Unit," which then disburses the funds to compensate the special deputies for their services.

Leis appointed Defendant–Appellant Don Rabold, a "regular" deputy, to run the special deputy program. Rabold had direct supervisory authority over all of the special deputies. His authority included the power to order an audit of the units, to order a special deputy to produce receipts for his claimed expenses, and to recommend discipline or termination of a special deputy.

Gratsch was assigned to the Eastern County Unit. Defendant–Appellant John Bowles was captain of the Eastern County Unit, and like Gratsch, was a special deputy. When Bowles first started the unit, he had a full-time job working as an inspector for the Cincinnati Water Works ("Water Works"). While he was with Water Works, he was suspended twice for neglect of duty, failure of good behavior, violation of the code of ethics and insubordination. Finally, he was terminated in 1987 when he was caught building valve chambers and installing air traps on a water main he was supposed to be inspecting. Apparently, Bowles had been doing paid work for private contractors while collecting overtime from the city for inspecting his own work. Leis knew about the circumstances

surrounding Bowles's termination from Water Works.

Defendant–Appellant Joe Corry acted as lieutenant, or second-in-command, within the Eastern County Unit. Corry was responsible for supervising the squad leaders and sergeants, training the unit, and representing Bowles in his absence. During his years with the Eastern County Unit, Corry observed Bowles billing for "double details." That is, Bowles would work two private duty details at once even though he could not remain at either one for the entire assignment. Corry reported Bowles to Rabold. Nothing in the record indicates Bowles was ever disciplined; however, Rabold admitted if Bowles were receiving compensation for work he had not completed, he would effectively be stealing.

A few years after becoming a special deputy and joining the Eastern County Unit, Gratsch was promoted to a sergeant's position in 1987. As a sergeant, Gratsch's responsibilities included acting as a squad leader, scheduling for units, and co-signing the checks disbursing unit funds. The unit treasurer, Gene O'Connor, often signed Gratsch's name, with Gratsch's permission, as the co-signor, and Gratsch would sometimes pre-sign blank checks. In November 1994, Bowles personally asked Gratsch to perform a private duty detail at his wife's birthday party. During the course of their conversation about the detail, Bowles indicated his intent to pay Gratsch out of unit funds. Gratsch repeatedly told him that would be improper, and when Bowles insisted, Gratsch finally told him he would work the detail free-of-charge as a birthday gift for Bowles's wife. Bowles had also enlisted the aid of another deputy, Shawn Robinson, to work the detail with Gratsch. Robinson was eventually paid $48.00 out of unit funds for his work at the birthday party, although Robinson told Gratsch he was never paid for the detail. Bowles did not get unit approval for the payment to Robinson.

During another incident that caused Gratsch concern, Bowles solicited a discount on a Honey Baked Ham. Bowles apparently asked the store manager "how much discount can I get on a ham." The regulations special deputies are required to follow while on duty provide it is a conduct violation to solicit gratuities. In the past, the Sheriff's office recommended discipline up to and including termination for one special deputy who had solicited a discount from Showcase Cinemas. Sergeant Charles Stein, the liaison officer between the Eastern County Unit and the Sheriff's office, testified during his deposition that Bowles would have been acting improperly if he did, in fact, ask for a discount.

Gratsch had a generally excellent performance record during most of his service as a special deputy. However, on one occasion in March 1995, Gratsch exhibited questionable judgment when he was on assignment with a new special deputy, Joann Taylor. Taylor wrote a letter to Bowles and Corry, claiming Gratsch placed her in a vulnerable position during a routine traffic stop by shining a spotlight at her that inhibited her vision. At another time, when Taylor tried to roll-up the patrol car window because she was cold, Gratsch activated the window-lock switch, preventing her from rolling-up the window, and said "try to roll it up now." In response to Taylor's complaints, on May 18, 1995, Lieutenant Corry recommended Gratsch be demoted from the rank of sergeant to patrol officer and placed on a one-year period of probation. Leis followed the recommendation in July 1995.

When Gratsch complained to his supervisors in July 1995 that he was entitled to

a hearing and representation by his attorney, Corry and Bowles recommended Gratsch be further disciplined for insubordination. Gratsch also contends he complained in November 1995 to Rabold about being disciplined without a hearing. In December 1995, Bowles informed Gratsch he was suspended for two months for insubordination. After his suspension, Gratsch received a paycheck with his signature on it. Although the unit check-signing policy had allowed for O'Connor to sign for Gratsch in the past, the policy did not contemplate the use of a suspended deputy's signature because "if they're not a participating unit member they don't have a vested interest in the good governance and fiscal responsibility of the unit." Shortly before Gratsch was suspended, Bowles had proposed purchasing a fax machine for his home using unit funds. At that time, Gratsch had recalled the incident regarding the birthday party detail, and he became concerned Bowles might be misusing unit funds. Gratsch was apparently alarmed to see his signature was still being used on checks disbursing unit funds, even after he had been suspended, since Gratsch had no way to monitor whether the expenditures were proper.

Gratsch decided to voice his concerns in December 1995, and he wrote the following letter to Rabold:

Dear Captain

Recently we had a meaningful meeting to discuss problems with the Eastern County Special Deputy Unit regarding procedures not being followed. Our checks issued by the unit to meet the payroll and pay our bills are a two (2) party signature check. I recently discovered that someone has been forging my signature on these checks. On December 5, 1995 at our unit meeting, Captain John Bowles asked what we thought of buying the unit a fax machine. Some-

one asked Captain Bowles where the fax machine would go. His response was "it would go in his house". After he didn't get a response from the members, Sergeant Janzen said he could get him one. On a worse case scenario, Captain Bowles could call Sergeant Gene O'Connor, have a check made out for a fax machine, forge my signature on the check, and the unit would have no record of the transaction. Furthermore, I do not wish to be caught in any type of embezzlement scheme.

Also, on October 29, 1994 Captain Bowles called me to get two (2) officers from our unit to work a surprise birthday party for his wife at The Farm on Anderson Ferry Road. He said this detail would be paid out of unit funds. I switched a 9N59 patrol that evening with another officer and had Shawn Robinson to also work this detail. I obeyed Captain Bowles order without question for fear of being insubordinate. Shawn Robinson nor I did not take any money from the unit for this detail.

On April 14, 1995 I worked a detail at Honey Baked Ham on Beechmont Avenue with Captain Bowles. After the store had closed, Captain Bowles asked an employee about a discount he was to receive on a ham. Captain Bowles suggested to this employee that he could possibly get an even better deal on a ham, perhaps maybe half off. Captain Bowles eventually did purchase a ham for half the regular price. There are other instances that involved other officers where procedures drafted in 1986 were not followed. There may be other infractions such as whether Captain Bowles is turning in the required 21–D's. I would like to take this opportunity to thank you again for taking your time in the meeting we had to discuss potential problems.

Truthfully Yours

William R. Gratsch

Rabold conducted an investigation into Gratsch's allegations. With regard to the claim Bowles attempted to use unit funds to pay Gratsch and Robinson to work at his wife's birthday party. Rabold reported:

> The ... allegation that Capt. Bowles charged the cost of the officer working traffic at his wife's birthday party in 1994 is accurate. S/D Shown (sic) Robinson received $48.00 in a unit paycheck for working the private party hosted by S/D Bowles. This expenditure was not approved before or after the party.... When interviewed, S/D Bowles stated that this in fact did occur and that he did not see anything wrong with this, it was "captain's expenses," and that at a unit meeting subsequent to the party the unit voted and approved this expense. (This did not occur.) He later, in his written explanation, claimed that he intended to reimburse the unit but forgot.

As for the claim Gratsch's signature was being forged on unit checks, Rabold concluded:

> The unit checks do require two authorized signatures, S/D Bill Gratsch's being one of them and the unit book-keeper S/D Gene O'Connor being the other. For at least the past three years S/D O'Connor has been signing Gratsch's name on the checks with Gratsch's knowledge and permission in that Gratsch had moved to Colerain Twp. and was not physically present to sign the checks and pay unit bills. Prior to this S/D Gratsch had been pre-signing blank checks for the same purpose at unit meetings, due to his being unavailable to be present when S/D O'Connor paid unit bills. S/D Gratsch has been receiving unit pay checks for a number of years with his signature signed by S/D O'Connor without complaint.

As a result of these findings, Rabold concluded Gratsch had "misrepresented the check signing allegation and presented it in writing as potentially a criminal act, forgery or embezzlement." Rabold further concluded that, although Gratsch was correct about Bowles soliciting the Honey Baked Ham discount, Rabold did not view this as a problem since no one from the company had complained.

In addition to finding evidence that supported at least two of Gratsch's allegations regarding specific instances of misconduct, Rabold also found evidence supporting Gratsch's general claims of misappropriation of unit funds. Significantly, Rabold reported Bowles regularly submitted handwritten expense vouchers on index cards for personnel expenses ranging from $375.00 to $475.00. Rabold stated "no receipts or other documentation for these receipts was offered or required." As a result of these findings, Rabold ordered an audit of all four special deputy units and required Bowles to produce receipts or to justify his expenditures. Along with his investigation results, Rabold provided the following with respect to Plaintiff–Appellee Gratsch:

> While one of S/D Gratsch's allegations was accurate, he misrepresented the check signing allegation and presented it in writing as a potentially criminal act, forgery or embezzlement. He also violated my direct instructions to come to me with any other problems with Capt. Bowles at a face to face meeting prior to his letter. He has threatened the unit leadership with legal action as a result of legitimate disciplinary actions taken and has generally been antagonistic to any type of corrective actions by his unit leadership. When the audit is completed, regardless of the results, I will be

recommending his termination from the special deputy program as well.

On October 21, 1996, Rabold notified Gratsch his special deputy commission was canceled. The memorandum to Gratsch's personnel file stated the following incidents evinced his failure to perform his duties: 1) his demotion due to the poor judgment he showed when training Joann Taylor; 2) his accusations of theft, forgery and embezzlement against Bowles and O'Connor which were investigated by Rabold and found to be "without basis;" 3) his absence from monthly unit meetings beginning in January 1996 and failure to document required county service time; 4) his behavior when Rabold attempted to interview him in 1996; 5) his failure to submit monthly off-duty detail records; and 6) his "failure to quality [sic] with his firearm with his unit in 1996."

## B. Procedural background

Gratsch commenced this lawsuit on October 23, 1997. On June 1, 1999, Defendants–Appellants moved for summary judgment as to all of Plaintiff–Appellee's claims, contending, *inter alia,* they were entitled to qualified immunity with respect to Gratsch's constitutional claims. Defendants–Appellants argued they were entitled to qualified immunity with respect to Gratsch's First Amendment retaliation claim because a similarly situated reasonable official would have believed Gratsch's statements in the December 1995 letter to Rabold were knowingly or recklessly false. They argued they were entitled to qualified immunity with respect to Gratsch's procedural due process claim because a similarly situated reasonable official would not have believed Gratsch had the right to a pre-termination hearing.

On March 24, 2000, United States District Judge Susan J. Dlott entered an Order denying the motions. In that Order, the district court indicated Defendants–Appellants were not entitled to qualified immunity with respect to the First Amendment claim because, as a matter of law, no reasonable official would have believed Gratsch's statements were knowingly or recklessly false. Regarding the procedural due process claim, the district court held Defendants–Appellants were not entitled to qualified immunity because "Gratsch has produced evidence which creates a genuine issue of material fact as to whether there was an understanding between the Sheriff's Department and special deputies that special deputies were entitled to a hearing prior to termination." The district court also denied summary judgment with respect to Plaintiff's Ohio state law claims.

Defendants filed this timely appeal, contending the district court erred in denying their motions for summary judgment. Subsequently, Gratsch moved to dismiss the appeal on the basis of lack of subject matter jurisdiction.

## II. ANALYSIS

Before turning to the merits of the case, we must first address Gratsch's contention this appeal should be dismissed because we lack jurisdiction to review the district court's denial of summary judgment. After evaluating the opinion of the court below, we conclude we may examine whether the district court properly applied the law of qualified immunity to the factual record before it. "A district court's order denying summary judgment that is based on qualified immunity and turns on an issue of law is immediately appealable as a final judgment under the collateral order doctrine." *Hoard v. Sizemore,* 198 F.3d 205, 211 (6th Cir.1999) (citations omitted). "However, ... 'this Court cannot review on interlocutory appeal a district court's determination that a genuine issue of fact exists for trial, ... but we retain jurisdic-

tion over the legal question of qualified immunity, *i.e.*, whether a given set of facts violates clearly established law." ' *Id.* (quoting *Mattox v. City of Forest Park,* 183 F.3d 515, 519 (1999)).

In their summary judgment motion, Defendants–Appellants argued they were entitled to qualified immunity with respect to Gratsch's First Amendment claim because a reasonable official could have believed the accusations Gratsch made in his letter to Rabold were either knowingly or recklessly false. After reviewing the evidence in the record, the district court concluded:

> On balance, the evidence regarding two of Gratsch's allegations is in his favor, and the facts of one allegation—check signing—are in dispute. The Court finds where Gratsch presented two allegations of misconduct that one of the Defendants investigated and found to be true, a reasonable official could not conclude that Gratsch's speech was knowingly or recklessly false. Accordingly, the Court denies qualified immunity to Defendants on this issue.

Because the district court determined, as a matter of law, that no reasonable official could believe, when faced with the facts presented, that Gratsch's statements were knowingly or recklessly false, the Court now has jurisdiction to review the appeal from that decision. *See Hoard,* 198 F.3d at 211.

With respect to Gratsch's procedural Due Process claim, the court below concluded a genuine issue of material fact existed regarding the question of whether the HCSD had an implied agreement with the special deputies that special deputies were entitled to a pre-termination hearing. While we may not at this point re-examine the district court's evaluation of the factual record, *see id.* (quoting *Mattox v. City of Forest Park,* 183 F.3d 515, 519 (1999)), the Court does have jurisdiction to review the

district court's conclusion that, if such an agreement did exist, Defendants–Appellants are not entitled to qualified immunity with respect to Gratsch's procedural due process claim. *Id.* The district court found Gratsch had come forward with evidence sufficient to support a conclusion the general understanding and practice within the HCSD was to give special deputies an informal pre-termination hearing. On the basis of that finding the district court held because "it should have been clear to a reasonable official at the time that Gratsch was terminated that a property interest could be created by state law or mutual understandings between the parties," if such a mutual understanding did exist, then Defendants–Appellants were not entitled to qualified immunity with respect to this claim. The district court's ultimate conclusion on the qualified immunity issue is therefore a question of law we may review at this time. *See Hoard,* 198 F.3d at 211.

■ The Court does not, however, have authority to review the district court's denial of summary judgment with respect to Plaintiff's state law claims. Defendants–Appellants contend they are entitled to immunity under *Ohio Rev.Code* 2744.03(A)(6). Although the Ohio Supreme Court has recently granted review in *Johnson v. Greene City Drug Task Force,* 89 Ohio St.3d 1410, 729 N.E.2d 382 (table) (2000), to determine whether qualified immunity claims are immediately appealable pursuant to *Ohio Rev.Code* § 2744.02(C), the current state of Ohio law holds statutes, such as § 2744.02, which presume to prescribe rules of procedure for the Ohio courts violate the separation of powers principle embodied in the state constitution. *See Burger v. City of Cleveland Heights,* 87 Ohio St.3d 188, 718 N.E.2d 912 (Ohio 1999) (applying *State ex rel. Ohio Academy of Trial Lawyers v.*

*Sheward,* 86 Ohio St.3d 451, 715 N.E.2d 1062 (Ohio 1999)). Interlocutory review is therefore not conclusively provided for under state law, and federal procedural rules do not allow for an interlocutory appeal in circumstances such as this where the state statute authorizes immunity from liability for damages only, as opposed to complete immunity from suit. *Accord Walton v. City of Southfield,* 995 F.2d 1331, 1342 (6th Cir.1993) (holding interlocutory appeal from denial of immunity was improper where Michigan statute provided only for immunity from liability, not immunity from suit). As a result, this Court reviews only the district court's denial of summary judgment on Gratsch's federal claims.

A. Standard of Review

The Court reviews a district court's denial of qualified immunity *de novo. Shehee v. Luttrell,* 199 F.3d 295, 299 (6th Cir. 1999); *Blake v. Wright,* 179 F.3d 1003, 1007 (6th Cir.1999). "[A] defendant appealing the denial of qualified immunity must accept the facts alleged by the plaintiff for purposes of the appeal." *Blake,* 179 F.3d at 1008 (citing *Berryman v. Rieger,* 150 F.3d 561, 563 (6th Cir.1998)). Because the Court reviews interlocutory appeals concerning qualified immunity on purely legal grounds and leaves all factual issues for trial, *Johnson v. Jones,* 515 U.S. 304, 313, 115 S.Ct. 2151, 2156, 132 L.Ed.2d 238 (1995), a ruling in the defendant's favor is inappropriate if a genuine issue of material fact exists as to whether the defendant committed acts that allegedly violated clearly established rights. *Buckner v. Kilgore,* 36 F.3d 536, 540 (6th Cir.1994).

B. The district court did not err in denying summary judgment as to all defendants with respect to Gratsch's First Amendment retaliation claim.

Immunity is a threshold issue courts must address before considering the merits of a case. *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Under the doctrine of qualified immunity "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* The ultimate burden of proof is on the plaintiff to show the defendant is not entitled to qualified immunity. *Wegener v. Covington,* 933 F.2d 390, 392 (6th Cir.1991).

The Court has repeatedly endorsed the following procedure for analyzing claims of qualified immunity:

Defendants bear the initial burden of coming forward with facts to suggest that they were acting within the scope of their discretionary authority during the incident in question. *[citation omitted]* Thereafter, the burden shifts to the plaintiff to establish that the defendants' conduct violated a right so clearly established that any official in defendants' positions would have clearly understood that they were under an affirmative duty to refrain from such conduct.

*Rich v. City of Mayfield Heights,* 955 F.2d 1092, 1095 (6th Cir.1992). The determination of whether an official's conduct violated a clearly established constitutional right involves two steps. First, a court must "ask whether the plaintiff has asserted a violation of a constitutional right at all." *Blair v. Meade,* 76 F.3d 97, 100 (6th Cir. 1996); *see also Mattox v. City of Forest Park,* 183 F.3d 515, 520 (6th Cir.1999) (holding failure to allege elements of constitutional violation is fatal to plaintiff's case). Once a plaintiff has stated a violation of his or her constitutional rights, the court must then ask whether an official's actions "were objectively unreasonable in

light of the clearly established constitutional right." *Bloch v. Ribar*, 156 F.3d 673, 678 (6th Cir.1998). The focus of the inquiry is not whether the claimed constitutional right was established on a general level, but whether on the specific facts of the case reasonable officials could disagree on whether the particular conduct under scrutiny violated the Constitution. *Anderson v. Creighton*, 483 U.S. 635, 640–41, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1997). The plaintiff and the court have the burden of identifying binding precedent from the Supreme Court, the Sixth Circuit or the district in which the court sits that unequivocally indicates the conduct in question was unconstitutional. *Cagle v. Gilley*, 957 F.2d 1347, 1348 (6th Cir.1992).

In this case, the parties do not appear to dispute Defendants–Appellants were acting within the scope of their discretionary authority when Gratsch was terminated. Thus, we may turn directly to the question of whether the district court was correct in concluding Gratsch has come forward with evidence sufficient to leap the qualified immunity hurdle. Defendants–Appellants first argue Gratsch has failed to allege a constitutional violation against Bowles, Corry and Rabold because he has not presented any evidence indicating they took positive action which led to his termination. To be liable for a violation of § 1983, an individual must encourage, authorize, participate or acquiesce in alleged misconduct. *Shehee*, 199 F.3d at 300. Here, the district court concluded Gratsch had presented evidence all three of these individuals either encouraged or directly participated in Gratsch's termination. If that is the case, then their involvement was adequate to establish their liability if, in fact, Gratsch's termination was unlawfully retaliatory.

■ Although Gratsch was more of an independent contractor or volunteer, rather than an employee, the district court appropriately analyzed his claims under the test applied to employee speech. His relationship with the state in this context resembled an employer-employee relationship more than it resembled the relationship between sovereign and private citizen. *See Bd. of County Comm'rs v. Umbehr*, 518 U.S. 668, 674, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996) (applying *Mt. Healthy* test in independent contractor context). A plaintiff seeking to establish a case of retaliation for speech protected under the First Amendment must point to evidence sufficient to establish three elements: 1) the plaintiff engaged in constitutionally protected speech; 2) the plaintiff was subjected to adverse action or was deprived of some benefit, and 3) the protected speech was a "substantial" or a "motivating factor" in the adverse action. *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977) (dealing with retaliatory termination of employment). Defendants–Appellants do not dispute Gratsch suffered an adverse action when his special deputy commission was terminated, nor do they dispute the fact Gratsch's termination was motivated, at least in part, by the letter to Rabold. Instead, the parties have focused on the first element, whether Gratsch engaged in speech protected by the First Amendment. Whether a plaintiff engaged in protected speech is a question of law for the Court. *Connick v. Myers*, 461 U.S. 138, 148 n. 7, 150 n. 10, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). Gratsch has the burden of proving his actions were constitutionally protected in this context. *Jackson v.. Leighton*, 168 F.3d 903, 909 (6th Cir. 1999).

In cases involving employee speech, we engage in a two-part analysis. First, the Court must determine whether the speech related to a matter of public concern. If the commentary related only to matters of

personal concern, our inquiry is, in most circumstances, at an end, and the plaintiff's claims should be dismissed. *Connick*, 461 U.S. at 147, 103 S.Ct. 1684 ("We hold only that when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior."). If, however, the Court determines the speech involved a matter of public concern, we then perform a balancing test to determine whether the government's interest in the efficient and effective provision of government services outweighed the employee's interest in speaking upon that particular matter. *Id.* at 150–54, 103 S.Ct. 1684; *Pickering v. Bd. of Educ.*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

In general, a matter of public concern is a "matter of political, social, or other concern to the community." *Connick*, 461 U.S. at 146, 103 S.Ct. 1684. However, even speech that tangentially touches upon matters of political, social or other concern to the community will not rise to the level of protected speech if it is made as an employee addressing matters of only personal concern, rather than as a citizen addressing the community agenda. *Id.* at 147, 103 S.Ct. 1684. Applying this definition, the district court concluded Gratsch's allegations about misconduct within his special deputy unit touched upon matters of public concern: "Certainly, in light of the state imprimatur placed upon the operation of special deputies, corruption in a special deputy unit is of public concern." In reaching that conclusion, the district court relied upon the following factors: 1) special deputies derive their power from the state and are often considered to be acting on behalf of the state; 2) they are subject to the same rules and regulations

as regular deputies; 3) special deputies, when they are working, are considered to be acting in an official capacity, even when they are working private details; and 4) the special deputies perform details on behalf of the Sheriff, not the private business owners.

We hold the district court's conclusion on this issue was correct. Unit funds are composed almost exclusively of contributions from the private employers for whom the special deputies work detail. Any potential misuse of those funds would therefore probably be of interest to a substantial number of individuals outside the special deputy program. Additionally, because special deputies derive their authority from the state, the public would most likely be interested in knowing about potential abuse of that authority. For these reasons, we find the district court was correct in determining Gratsch's letter to Rabold touched upon matters of public concern.

Once the district court concluded Gratsch's letter touched upon matters of public concern, it then turned to the balancing prong of the *Pickering* test. "Public interest is near its zenith when ensuring that public organizations are being operated in accordance with the law...." *Marohnic v. Walker*, 800 F.2d 613, 616 (6th Cir.1986). Gratsch's letter indicated the Eastern County Unit was not being operated according to law. When the district court balanced the public's interest in knowing about that failure against Defendants–Appellants' unsubstantiated allegations Gratsch's letter would lead to disruption in the unit, it determined Gratsch's claim survived the second prong of *Pickering*. We agree with this determination. Although Gratsch's conduct might have led to tension between him and his superiors, his disclosure of potential corruption in the unit actually furthered the state's ultimate interest in the efficient and lawful adminis-

tration of its public duties. Because Gratsch's letter satisfied both prongs of the *Pickering* test, the district court appropriately held it constituted protected speech.

Defendants–Appellants argue Gratsch was terminated solely on the basis of his accusations of forgery and embezzlement, which they contend were knowingly or recklessly false. Deliberate or reckless misstatements do not rise to the level of protected speech. *Gossman v. Allen,* 950 F.2d 338, 342 (6th Cir.1991). As a result, if Gratsch's statements about the forging of his signature and potential embezzlement were false, and if his termination was motivated by those statements alone, rather than the letter as a whole, his First Amendment claim would fail as a matter of law. The district court, however, concluded genuine issues of material fact existed regarding the truth or falsity of Gratsch's allegations. The record supports this determination. Viewing the facts in the light most favorable to Gratsch, a reasonable fact finder could conclude Gratsch only became concerned about the use of his signature on the checks after he had been suspended from the unit, when he could no longer monitor how the unit funds were disbursed. Bowles's discussions about the purchase of a fax machine for his home provide a factual basis for Gratsch's concerns about possible embezzlement. Because resolution of this issue involves resolution of material factual disputes, the district court could not say, as a matter of law, that Gratsch's allegations about forgery and embezzlement were knowingly or recklessly false statements, unprotected by the First Amendment. As a result, the district court correctly concluded Gratsch had stated a claim for First Amendment retaliation.

Defendants–Appellants alternatively contend even if Gratsch has stated a claim

for a constitutional violation, they are shielded from liability because they would have terminated Gratsch regardless of whether he wrote the letter to Rabold. A state employer may escape liability if it can show it would have taken the same employment action without regard to the employee's speech. *Mt. Healthy,* 429 U.S. at 274, 97 S.Ct. 568; *Jackson,* 168 F.3d at 909. In this case, Defendants–Appellants claim they would have terminated Gratsch because he abandoned his commission when he ceased to perform his voluntary duties for more than six months. The district court found, however, Gratsch had presented evidence he was absent during that time period only because Defendants–Appellants suspended him from the unit and stopped scheduling him for details. In light of the district court's finding, it appears a genuine issue of material fact exists regarding the question of whether Defendants–Appellants are entitled to claim the affirmative defense, and the district court therefore appropriately declined to grant summary judgment to Defendants–Appellants on this basis.

■ Because Gratsch presented evidence sufficient to at least create a triable issue on all three elements of a First Amendment retaliation claim, he satisfied the first part of the qualified immunity analysis. The second part of that analysis involves the district court's determination, as a matter of law, no reasonable official could have believed the allegations contained in Gratsch's letter to Rabold were knowingly or recklessly false. Because Gratsch's right to speak on matters of public concern was clearly established at the time of his termination, *see Pickering,* 391 U .S. at 563, 88 S.Ct. 1731, Defendants–Appellants may only lay claim to qualified immunity if a reasonable official could have believed Gratsch's statements were knowingly or recklessly false. *Gossman,* 950 F.2d at 342. The actual truth or

falsity of Gratsch's speech is not the issue. Rather, the issue is whether a reasonable official would have believed Gratsch had knowingly or recklessly made false accusations. *Id.*

Leis, Rabold, Bowles and Corry all had cause to know at least two of Gratsch's allegations were true. The evidence on the third issue, regarding Gratsch's allegations of forgery and embezzlement is equivocal. However, Rabold's investigation revealed Bowles had submitted questionable requests for expense reimbursement, and unit funds were sometimes used without Gratsch's knowledge in a manner Gratsch considered to be improper, *i.e.,* the $48.00 payment to Robinson. The results of the investigation caused Rabold enough concern that he ordered an audit of all the special deputy units, and told Bowles he had to provide receipts for claimed expenses from that point on. In light of this evidence, the district court found no reasonable official could have concluded Gratsch's allegations were either recklessly or knowingly false. We are inclined to agree. The Court finds it difficult to conceive of a reasonable official who, after substantiating all of the material portions of a whistleblower's allegations, would recommend termination on the basis those allegations were knowingly or recklessly false. Consequently, we conclude the district court was correct in denying qualified immunity with respect to Gratsch's First Amendment retaliation claim.

C. The district court appropriately declined to extend qualified immunity to Defendant–Appellant Leis with respect to Gratsch's procedural Due Process claim. The district court erred, however, in failing to grant summary judgment on this claim as to Bowles, Corry, and Rabold.

■ As discussed above, evaluation of a qualified immunity claim involves answering two questions: 1) did the plaintiff suffer a deprivation of his clearly established constitutional rights; and 2) did the defendant act in an objectively unreasonable manner in light of the clearly established constitutional right. *Bloch,* 156 F.3d at 678. To state a claim for a procedural due process violation in the employment context, a plaintiff must show he had a property interest in continued employment, and he was not provided the constitutional minimum of due process before termination. *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 541–42, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). Here the parties do not dispute the fact Gratsch never received a pre-termination hearing. Thus, the district court's analysis and the parties' arguments focus on whether Gratsch had a legitimate expectation of continued employment.

■ After evaluating the evidence in the light most favorable to Gratsch, the district court found a reasonable juror could conclude special deputies had a right to a hearing prior to termination of their commissions. As a basis for this conclusion, the district court relied upon the following evidence: 1) two special deputies, Deanna Rauen and Defendant–Appellant Bowles, received pre-discipline hearings; 2) Bowles indicated during his deposition that hearings were customary; 3) Stein, the liaison between the HCSD and the special deputy program, testified special deputies customarily received hearings before being disciplined; 4) special deputies are subject to the same rules, regulations and procedures as regular deputies; and 5) Sean Donovan, Chief Deputy Sheriff, stated in a deposition that §§ 3.23–3.26 of the "Rules, Regulations, and Disciplinary Process" Manual, which provide for pre-discipline hearings, apply to special deputies. On appeal from

a denial of qualified immunity, this Court does not have jurisdiction to review the district court's finding a material issue of fact exists regarding Gratsch's right to a pre-termination hearing. Thus, for our purposes, we presume a reasonable juror, viewing the evidence in the light most favorable to Gratsch, could conclude special deputies were entitled to some sort of pre-termination hearing.

At the time Gratsch was terminated, the law was clear property interests could be created by mutual understandings between the parties. *Perry v. Sindermann*, 408 U.S. 593, 601, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). If the two parties had a mutual understanding Gratsch had the right to continue working as a special deputy absent a pre-termination hearing, then he was deprived of procedural due process when his commission was terminated without a hearing. Thus, by coming forward with evidence sufficient to create a triable issue with respect to his right for a hearing, in addition to evidence he was terminated without one, Gratsch stated a claim for deprivation of procedural due process, satisfying the first prong of the qualified immunity analysis.

In support of their claim to qualified immunity regarding the alleged Due Process violation, Defendants–Appellants Rabold, Bowles and Corry again assert they had nothing to do with the decision to terminate Gratsch, and the record is clear they lacked any authority to order a pre-termination hearing. As discussed earlier, the district court found Gratsch had presented evidence indicating these three actively participated in, or encouraged Gratsch's termination. Encouragement of the termination is not, however, sufficient to give rise to liability for a violation of Gratsch's Due Process rights. In this claim, the alleged violation is not the termination itself, but rather the manner in which that termination was carried out. The record does not disclose, nor did the court below point to, any evidence Rabold, Bowles or Corry had anything at all to do with the denial of a hearing. As a result, the district court was incorrect in concluding Gratsch had stated a procedural Due Process claim as to these Defendants–Appellants, and their motions for summary judgment on this claim should have been granted.

Leis, on the other hand, acknowledges he did have authority to order a hearing. With respect to the sheriff, we are therefore left to examine the second prong of the qualified immunity analysis—whether Leis acted in an objectively reasonable manner. If it was generally understood special deputies were entitled to a hearing before their commissions were terminated, then an objectively reasonable official would not have believed Gratsch's commission could be terminated without a hearing, and Leis is not entitled to qualified immunity.

Leis attempts to get around the district court's decision by arguing a reasonable official, interpreting the rules and regulations regarding special deputies, could have concluded Gratsch was not entitled to a hearing. This argument misses the point. The district court concluded Gratsch had come forward with evidence tending to show the HCSD had an actual practice of granting pre-discipline hearings to the special deputies, and it was generally understood by the sheriff and the special deputies that special deputies were entitled to such hearings. Any determination regarding the reasonableness of Leis's actions in terminating Gratsch without a hearing depends upon the resolution of the factual dispute over past practice and the general understanding in the department. As a result, we hold the district court was correct in concluding Leis was not entitled

to claim qualified immunity, at least not at the summary judgment stage, with respect to Gratsch's procedural Due Process claim.

## III. CONCLUSION

For all of the reasons set forth above, we AFFIRM IN PART and REVERSE IN PART the district court's denial of summary judgment and REMAND the case to the district court for further proceedings consistent with this opinion.